People of the State of Illinois, Plaintiff-Appellee, v. James E. Trice (Impleaded), Robert L. Fair (Impleaded, Defendants-Appellants.

Gen. No. 53,343.

First District, Second Division.

July 21, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (William J. Martin and James B. Haddad, Northwestern University School of Law, of Evanston, and Theodore A. Gottfried, Assistant Public Defender, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James W. Dempsey, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

These appeals are from convictions for armed robbery. After a jury trial both defendants were sentenced; Robert Fair to three to fifteen years in the Illinois State Penitentiary, and James Trice to two to ten years.

On December 20, 1967, William Minor was working his paper route on the south side of Chicago. At about 6:00

p. m. he noticed two men following him, so he turned into a hallway of a building and rang some doorbells in an unsuccessful attempt to gain entrance to the building. Defendant Trice followed him into the building, after which defendant Fair entered and placed a pistol against Minor's head. Fair then put the gun in his pocket and the three walked to an adjoining gangway, where the defendants took a watch, jacket, gloves and $3 from Minor. They then gave him instructions as to how long he should remain and what he should tell the police. Minor immediately reported the robbery and gave the police a general description of the men.

Two days later, when Minor was sitting in a restaurant at about 5:00 p. m., he saw the two defendants walking past the restaurant. He ran outside to a police car parked two doors away, informed the officers of the robbery and said he thought he had just seen the men who robbed him. After driving with the police to a place near the defendants, Minor stayed in the car while the officers walked over to the two men. When they returned to the car Minor identified the defendants as the men who had robbed him. He further identified the coat and gloves defendant Trice was wearing as those which were taken from him in the robbery. A search of the two defendants revealed that each had a .22-caliber starter pistol in his possession. At the trial Minor identified People's Exhibit No. 2—the pistol recovered from Fair—as similar to the one used in the robbery.

On June 6, 1968, a jury was impaneled for the joint trial of Fair and Trice, but no evidence was heard that day. The following morning Trice was absent from court. A defense motion for a continuance on the ground of his absence was denied, and a hearing was then held on the joint motion of the codefendants to suppress the pistols seized at the time of the arrest. That motion was denied. On that same day the State put Minor on for direct

examination, and defense counsel began his cross-examination.

Trice was present on the next court date and presented a motion for mistrial because of the ex parte nature of the proceedings of the last court date. The motion was denied and the trial proceeded. Both men were found guilty of armed robbery.

Both defendants argue that they were not proved guilty beyond a reasonable doubt, and that the prosecutor's closing argument was so prejudicial as to require reversal. Defendant Trice also argues that he was denied his right to appear and defend in person and to confront the witnesses, and that it was error to have admitted into evidence the pistol taken from him. Defendant Fair argues that the record does not substantiate the use of a "dangerous weapon," one of the elements of the crime of armed robbery.

Both defendants argue that they were not proved guilty beyond a reasonable doubt because they were not properly identified as the assailants. Defendant Fair argues that the only eyewitness to the robbery—William Minor—offered identification testimony which was thoroughly impeached through his testimony at the preliminary hearing; and that his testimony must therefore be considered so vague and uncertain that the conviction must be reversed.

At the trial Minor testified unequivocally that Fair was the second man to walk into the well-lit hallway, and that he stood just one foot from him when putting the gun to his head. He also stated that Fair did not camouflage his face when he entered the hallway, and added that "as he came over to my right side he passed in front of my face." Minor testified that when the defendants took him into the gangway which was "fairly well lit," Fair "squatted down so that his face was about one foot from mine," and told Minor that if any-

one asked him he was to say that he had been robbed by the Blackstone Rangers.

■ Defendant Fair's contention is that Minor's identification of Trice was impeached and that, therefore, his entire testimony concerning identification of either party should be rejected. However, we must consider that a reversal on the basis of testimony offered concerning a codefendant could only prevail where the State's evidence was shown to be so unbelievable that none of the testimony could be accepted. That situation does not appear in the instant case, and Minor's identification of Fair was clear and convincing.

■ ■ The pockmarks on Fair's face were the only feature which Minor admitted he did not recall and had not testified to. It is impossible for us to attach any great importance to this fact without knowing more about the size and nature of the marks. We cannot reverse a conviction simply because a witness fails to account for every detail of the appearance of his assailant. Minor testified that Fair did not attempt to cover his face when he stood one foot from him and put a gun to his head, and that when Fair kneeled next to him Minor got another look at him. The jury was justified in basing the conviction upon such testimony.

Trice's complaint regarding Minor's identification of him is far more direct. He argues that a comparison of the testimony given by Minor at the preliminary hearing with his testimony at the trial is conflicting with regard to the identification of Trice. He urges that Minor was impeached at the trial through use of the preliminary hearing proceedings when he said he never saw the first man's face—the man he now claims was Trice.

At the trial Minor identified Trice as the first man to enter the hallway when he said, ". . . the defendant Trice walked into the hallway with his hand over his hat and his head bowed. He had on a long grey coat and a

315

blue hat. There was a light on in the hallway at that time. I saw Mr. Trice's face when he first entered the hallway." Later in his testimony Minor said, "Trice told me to stop looking at him." He also added, referring to the incident in the gangway, "Trice then stooped down so that his face was about one foot from mine and told me to lie there for ten minutes and to turn my head the other way."

On cross-examination, defense counsel made much of the testimony Minor had given at the preliminary hearing when he said, "See, what it was, he told me [referring to Trice] don't look at them. The first time when I do a little like that he slapped me like that and said don't look at him, and I just turned my head down like that. He started taking me in the gangway like this." This is consistent with his testimony at the trial that "Trice told me to stop looking at him." At the preliminary hearing, again referring to Trice, Minor said, "Yes, I seen them as they were approaching the hall as they were coming in. He had came in with his head down like that [indicating], with his hat and hand over it like that [indicating], and asked me did I live in here." This also is consistent with his testimony at the trial that ". . . Trice walked into the hallway with his hand over his hat and his head bowed."

· ■ At the preliminary hearing, referring to the incident in the hallway, the defense attorney asked Minor about Trice, saying, "So you never did get a look at his face, did you?" Minor answered, "No really, no. But I do remember the other. That is natural. He did not have on a hat." Minor later explained his testimony by saying, "I was not asked at that time whether I saw Trice's face when they told me to lie down on my stomach while in the gangway. I saw Trice's face when he stooped down. He was about two feet from my face looking directly at me. . . ." We see no reason why the jury was not entitled to accept this plausible explanation

of what otherwise appears to be a difference in testimony at the preliminary hearing and the trial. Accepting the explanation, the only discrepancy between Minor's testimony at the hearing and at the trial is his statement at the trial that he saw Trice's face when he first entered the hallway, and his statement at the hearing that he did not see Trice's face as he entered the hallway. However, we believe that his testimony at the trial must be read together with his further testimony that Trice walked in with his head down and told him not to look at him. Considering Minor's testimony as a whole, it would appear that his identification testimony was not vague, uncertain or doubtful, and was sufficient to sustain the convictions. People v. Gardner, 35 Ill2d 564, 471, 221 NE2d 232; People v. Pride, 16 Ill2d 82, 90, 156 NE2d 551.

Defendant Trice complains of the trial progressing in his absence and argues that such action denied him his right of confrontation. He was present on June 6, 1968, when the jury was impaneled, but was absent the next day when the trial was to commence. On that date a joint motion to suppress was heard and denied and direct testimony and part of the cross-examination of Minor was heard. The question presented to this court is whether Trice's absence can be considered a waiver of his right to be present during his trial.

██ Trice was free on bail during the trial and was present for the first day of the proceedings. In People v. Steenbergen, 31 Ill2d 615, 203 NE2d 404, at page 618 the court said: "It is not only defendant's right to be present, but it is also his duty, especially where he has been released on bail. To allow a defendant to stop trial proceedings by his voluntary absence would allow him to profit by his own wrong." In that case the defendant was free on bail and was present when the trial began on January 25, 1963, when the court ordered the case continued until January 28, 1963. Defendant was

317

absent on that day "despite the fact that he knew when his trial would resume. There is no evidence to show the reason why he did not appear. . . . Since there is nothing in the record to indicate that defendant's absence was anything but voluntary, he waived his constitutional right to be present at his trial on January 28, 1963." [Ibid.]

In the instant case, after the jury was impaneled on June 6, 1968, the judge told them to return to the assembly room the following morning at 11 o'clock, and the trial was adjourned until that time. The defendant was present then and knew of the adjournment. The following day he was absent. Under such circumstances, we believe that the Steenbergen opinion is directly in point.

In People v. Davis, 39 Ill2d 325, at 330, 235 NE2d 634, the court said: "In those cases where a defendant voluntarily absents himself from the courtroom after the trial has commenced it is uniformly held to be a waiver of the right to be present, leaving the court free to proceed with the trial in like manner and with like effect as if he were present." In that case the court reversed the conviction and remanded the case for a new trial, since the defendant, unrepresented by an attorney in a felony prosecution, had never appeared in court, yet a jury was impaneled, State's evidence was presented, and a guilty verdict returned.

■■ In the case before us, we are dealing with an entirely different situation. Here the defendant was initially present, represented by counsel, then chose to absent himself the following day without any explanation. We think it totally irrelevant that after the guilty finding, a reason was offered by the defendant to explain his absence. The question before us is did the trial court act properly at the time it proceeded with the trial in the unexplained absence of the defendant. We hold that the defendant had waived his right to be present

and that no error was committed by the trial court's proceeding with the trial in the defendant's absence.

■ Both defendants urge that the prosecutor's closing argument was so prejudicial as to require reversal of the convictions. We agree that the closing argument did include certain statements by the Assistant State's Attorney which were improper and that the trial consequently was made less perfect. The reference was that the technique of impeaching Minor was "a trick." Over objection the prosecutor argued, "These are men, twenty-one years old. And nothing but thugs. Blackstone Rangers, as they said. These are the people who are preying on everybody on the street." Minor's testimony was that Fair had told him to say he had been robbed by the Blackstone Rangers. That testimony is subject to several interpretations, one of which is that the defendants were Blackstone Rangers; another, that they were trying to place the blame on a group with which they were not affiliated. Minor's testimony on this matter had not been objected to during the trial, and the jury had heard the testimony, so could evaluate the prosecutor's argument. We do not think this part of the argument was proper; however, viewing the record as a whole, it does not constitute reversible error.

■ In People v. Bravos, 114 Ill App2d 298, 252 NE 2d 776, this court said at page 320: "Convictions are not reversed simply because either or both sides made a few comments which would have been better not made." Unless it appears that the verdict would have been different had the improper closing argument not been made, the conviction will not be disturbed. People v. Hines, 30 Ill2d 152, 157, 195 NE2d 712; People v. Naujokas, 25 Ill2d 32, 38, 182 NE2d 700.

■ When the defendants were arrested and searched, each had a pistol in his possession. Trice complains that the pistol found on him was improperly admitted since it was never alleged that he had used

319

the weapon, nor had it been suggested that two guns were used during the robbery. In People v. Lenhardt, 340 Ill 538, 173 NE 155, at 549, the court said: "It is competent to prove that an accused person, when arrested, possessed a weapon suitable for the commission of the crime charged against him, even though no claim is made that he actually used it in committing the particular crime. People v. Powloski, 311 Ill 284." People v. Smith, 413 Ill 218, 221, 108 NE2d 596. It is also admissible to show the circumstances of the arrest. People v. Jackson, 9 Ill2d 484, 492, 138 NE2d 528.

It is undisputed in the instant case that both guns were starter pistols. The defendants were charged with armed robbery, "in that they, by the use of force, and while armed with a dangerous weapon," robbed William Minor. The question thus arises whether a starter pistol is a "dangerous weapon" within the meaning of Ill Rev Stats 1967, c 38, § 18–2(a).

■■ ■ In People v. Dwyer, 324 Ill 363, 155 NE 316, at page 365, the Supreme Court said:

> "Where the weapon in question and the manner of its use are of such character as to admit of but one conclusion, the question whether or not it is deadly is one of law for the court to determine, but when the character of the weapon is doubtful or the question depends upon the manner of its use it is a question for the jury to determine from a description of the weapon, from the manner of its use and the circumstances of the case."

In the case before us there was testimony regarding the character of the pistol used in the robbery; the question of whether or not the weapon was dangerous was one of fact, since it could not be said that the character of the weapon could admit of only one conclu-

sion. By returning a verdict of guilty on the charge of armed robbery, the jury has rendered its decision that it was convinced "that there was sufficient evidence to sustain the charge that the pistol was a deadly weapon." People v. Dwyer, supra, page 365.

There was testimony in the present case that the weapon was held to the head of the victim; there was also testimony that a charge from a shell can create a high flash and cause considerable damage. Based on such testimony the jury was entitled to conclude that the weapon was dangerous. The judgment is affirmed.

Affirmed.

LYONS and BURKE, JJ., concur.