THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LUIS LeBRON, Defendant-Appellant.

First District (4th Division)   No. 78-585

Opinion filed April 24, 1980.

James J. Doherty, Public Defender, of Chicago (Robert Guch and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Luis LeBron, was convicted of three counts of voluntary manslaughter (Ill. Rev. Stat. 1973, ch. 38, par. 9—2). He was sentenced to 3 concurrent terms of not less than 6 nor more than 18 years. Defendant appeals from his conviction. We affirm the trial court.

Defendant contends on appeal that (1) he was denied a fair trial, free from prejudicial error, where certain physical evidence was wrongly admitted, and (2) the prosecutor's closing argument was improper and prejudicial.

Jesse Abrego testified for the State that on August 10, 1975, at approximately 12:50 a.m., a small crowd gathered outside the Nite Lite tavern located at the corner of Tripp Street and North Avenue, in the city of Chicago. People were arguing and yelling at one another. According to the witness, defendant ran away from the crowd and away from North Avenue toward him (Abrego) and his companion, Joanne Santiago. Defendant was dressed in a dark velvet jacket and black trousers. Abrego testified that defendant stopped near the fence at the back of the tavern and stated, "If you MFers don't like it, I'll come back and kill you." He then reached into his jacket and drew out a revolver. Thereafter, he walked approximately 20 feet to a little side door near the fence on the right side of the tavern. Defendant raised the revolver and fired five shots in the direction of the men outside the tavern.

Abrego further testified that the first gunshot struck Johnny Flores. The second and third shots struck Arthur Arcia, and the fourth and fifth shots struck Joseph Morris. After defendant fired the fifth shot, he turned and ran toward the alley. He stopped in the alley and "took something out of the gun [and] put it in his hand." In the alley he was joined by two other men and they all proceeded eastward down the alley.

The witness stated he walked toward the tavern after defendant fled.

He observed the three bodies and called the police. When the police arrived, they asked some of the people whether they saw anything happen; there were no responses. While the police were searching the grassy area next to the building, Abrego told them to look in the alley by the telephone pole. There, the police found a suspended shell and four casings.

Abrego gave an investigator a statement regarding the shootings and told the police he would go to the police station and give a statement if they so requested.

Patricia Paris, who lived across the street from the Nite Lite tavern, testified that at about 3 a.m. on August 10 plain-clothes officers spoke with her in her apartment. She told them she saw the gunman approach the corner from the north, and when he reached the corner he fired four or five shots. During the defense's case, Officer Radke testified Patricia Paris told him that after the assailant fired the shots he fled, along with three other men.

On the morning of August 10, 1975, Investigators Storck and Mudry were assigned the investigation of the triple homicide. On that same day, Storck interviewed Robbie Rivera and Esteban Rosario. The officer obtained a description of the assailant, but not his identity. After further investigation on that date, Officer Storck contacted several security agencies. On August 12, he and Investigator Mudry, accompanied by Rosario, went to defendant's place of employment. Rosario went inside the building and upon returning told the officers the man they were looking for was inside.

Investigators Storck and Mudry entered the building and saw defendant toward the rear, dressed in a security guard uniform. The officers asked defendant to surrender the weapon on his person, which he did. Thereafter, he was arrested and taken to the police station.

A lineup was held on the afternoon of August 12, 1975. Defendant participated in the lineup, dressed in a velvet jacket with a boutonniere, pants and shirt. Jesse Abrego, Patricia Paris, Rosario, and John Mocheo viewed the lineup. Abrego identified defendant as the person who shot the three men on August 10, 1975. John Mocheo told Abrego he could not pick the assailant out of the lineup.

Jesus LeBron, defendant's father, stated that on August 11, 1975, defendant gave him a gun and instructed him to put it in the house. Thereafter, Jesus LeBron gave the gun to defendant's brother-in-law, Nelson Cortez. Officer Sesso testified that on August 14, 1975, he visited the home of Nelson Cortez and spoke with him. After their conversation, the officer left and thereafter placed the building under surveillance. Cortez later went out the rear door of the premises and placed a brown

paper bag over a fence. Officer Sesso retrieved the bag which contained the gun.

Officer Smith, a firearms identification expert, identified the revolver as the gun which fired the shell casings found in the alley behind the Nite Lite tavern. He also identified the gun as having fired the bullets removed from Arthur Arcia and Joseph Morris.

Tirso Escanio testified for the defense, stating that on the night of the shootings he was at the Nite Lite tavern. He stated that during the band's intermission he and a friend went outside. He noticed a fight break out near the back door of the tavern involving defendant and six Americans. He stated that so many people were talking at once he could not understand what anyone was saying. Escanio told the court his attention was drawn to the crowd when somebody called out " 'A man pulled out a gun.' " He stated that someone had also said, " 'Mike, pull out the gun,' " but he did not know who made the statements.

At certain points during Escanio's testimony, he gave conflicting statements. Initially, he testified that when the first shot was fired he did not know where it came from, subsequently, he testified the shot came from defendant and the others. He also stated that when the first and second shots were fired defendant and three other people were struggling with the gun on the back fence; thereafter, he testified that after the second shot he saw defendant struggling with three other people near the rear door of the tavern. Still later, he testified defendant had his back against the fence with three men facing him.

Escanio further testified that one man was struggling with defendant and another was hitting him. He also stated they were punching defendant, the defendant "went down," and they were "rolling against the fence" as defendant struck back with his hands. He did see "something" in defendant's hands as defendant rolled along the chain fence to the alley. Finally, the witness stated he was in his car and started to drive away slowly after the second shot, and he saw defendant run, alone, toward North Avenue.

The court allowed into evidence both revolvers; the gun that was used in the shooting and the gun defendant surrendered to police at the time of his arrest. Defendant's jacket with the boutonneire, shirt, and pants were admitted into evidence, although defendant objected to sending to the jury clothing the police officer gave him to wear in the lineup. The court overruled the objection.

Defendant contends he was denied a fair trial, free from prejudicial error, where certain physical evidence was improperly admitted. Defendant's shirt and pants were admitted into evidence, allowed to go to the jury, and commented upon by the prosecutor in closing remarks. The

State maintains defendant was not denied a fair trial when the shirt and pants were admitted into evidence and commented upon by the prosecutor.

■■ There must be a proper foundation laid before physical evidence can be admitted. The physical evidence must be connected with both the crime and the defendant to be admissible at trial. *People v. Rogers* (1976), 42 Ill. App. 3d 499, 502, 356 N.E.2d 413, 415.

Defendant asserts there was no evidence at trial that established defendant had worn the shirt or pants in question on the night of the shootings. Defendant points to testimony given by Officer Storck that although Officer Mudry had received these clothes from defendant's wife they were not worn by defendant on the night of the shootings. This is not a totally correct statement of the evidence. According to the record, Officer Storck initially stated he did not believe defendant was wearing the shirt and pants in the lineup; thereafter, when he was shown the shirt and pants, he recognized them as the clothing provided by defendant's wife and worn by defendant in the lineup.

A foundation for the introduction of objects into evidence may be laid either through their identification by a witness or through the establishment of a chain of custody. *People v. Mendoza* (1978), 62 Ill. App. 3d 774, 776, 379 N.E.2d 380, 382-83.

Defendant contends the State stressed the clothing in its closing argument by stating the shirt and pants were worn by defendant on the night of the shootings, and neither the pants nor the shirt was physically damaged. The State contended the condition of the clothing was inconsistent with defendant's assertion that he had been in a struggle and the shootings were done in self-defense. Defendant relies on *People v. Rogers* (1976), 42 Ill. App. 3d 499, 356 N.E.2d 413, to support his position. In *Rogers*, the State's inability to establish a chain of custody for certain evidence coupled with the prosecutor's statements at opening and closing argument caused reversible error.

We find in our reading of *Rogers* that the court based its decision on the cumulative effect of the errors it found and for this reason held that the defendant did not receive a fair trial, free from prejudicial error.

■■ In the present case, it was established on redirect examination of Officer Storck that the shirt and pants defendant wore in the lineup was the same clothing given to Officer Mudry by defendant's wife; but there was no clear testimony in the record to support the State's allegation that the shirt and pants, which were admitted into evidence, were worn by defendant on the night of the shootings. However, we do not find this to be error which would justify reversal of the jury's verdict. The defendant was positively identified by an eyewitness. Moreover, there were State's

witnesses who testified there was no struggle or fight between defendant and the other men. We find any error that may have been committed in admitting the shirt and pants into evidence, sending them to the jury, and allowing the prosecutor to comment on them was harmless in light of the overwhelming evidence of defendant's guilt. See *People v. Bailey* (1979), 77 Ill. App. 3d 953, 957.

Defendant also contends the trial court erred when it admitted into evidence the gun worn by defendant while on duty as a security guard. We disagree.

Defendant is correct in his statement of the law that a gun must be sufficiently connected with the defendant and the crime to be relevant evidence. (*People v. Jones* (1961), 22 Ill. 2d 592, 599, 177 N.E.2d 112, 116.) However, in *People v. Upshire* (1978), 62 Ill. App. 3d 248, 252, 379 N.E.2d 38, 41, the court stated:

> "Even though a particular weapon was not used by the accused during the commission of the crime, it may be the subject of testimony concerning the details of arrest and may be admitted into evidence."

At the time of defendant's arrest, he was carrying a weapon which was part of his uniform as a security guard. He voluntarily gave the police his gun at the time of his arrest. Later, it was determined the gun defendant had on his person was not the gun that was used in the shootings. Two days after defendant's arrest, another gun was recovered near the home of defendant's brother-in-law. This gun was found to have fired the bullets on the night of the shootings.

Defendant cites *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, as similar to the instant case. We find *Wade* and the present case have very different fact situations.

In *Wade*, the murder weapon was not present at the trial but the prosecutor elicited extensive testimony from the police regarding a gun they found on defendant at the time of his arrest. The People stipulated that the ballistics evidence would show the weapon found on defendant was not the murder weapon. However, this court stated, in reversing the trial court, that offering the gun to the jury was extremely prejudicial and constituted reversible error. The weapon in the instant case was clearly admissible as the subject of testimony concerning the details of the arrest.

Defendant contends that portions of the prosecutor's closing argument were improper and prejudicial. The State, in its closing argument, referred to the pants and the shirt as being worn by defendant on the night of the shootings. Defendant also contends the statement made by the prosecutor regarding the condition of the clothing prejudiced defendant. The prosecutor's comments regarding the clothing

were improper, based on the evidence. However, we do not find prejudicial error resulting from his statement. The argument did not constitute a material factor in the conviction nor did it result in substantial prejudice to the accused. We cannot find that the verdict would have been " 'different had the improper closing argument not been made * * *.' " *People v. Bach* (1979), 74 Ill. App. 3d 893, 898, 393 N.E.2d 563, 567, quoting *People v. Trice* (1970), 127 Ill. App. 2d 310, 319, 262 N.E.2d 276, 281.

■ Defendant objects to the comment the State made concerning the guns being "mates." The prosecutor stated:

> "[At the time of defendant's arrest] the defendant was carrying in his possession, People's Exhibit No. 21-A, this gun. [Indicating.] This gun is a mate to the murder weapon."

We do not believe these remarks were prejudicial to defendant. The firearms expert testified the two weapons had similar class characteristics and they both had certain basic operation conditions. The prosecutor's remarks regarding the guns were not improper and should not have prejudiced the jury.

■ Defendant further contends the prosecutor injected his own opinion of defendant's guilt in his closing argument.

> "I ask you to think about each one of those instances, because after all, ladies and gentlemen, those are three human beings. And I ask you to give each one of those persons, and the State, who is bringing the charges against this gentleman—
>
> [Defense]: Objection, Judge—
>
> [Prosecutor]: a fair trial as to each one—
>
> [Defense]: Objection, your Honor.
>
> [Prosecutor]: as to each one of those three.
>
> The Court: Overruled."

Defendant asserts these remarks constituted an expression of the prosecutor's opinion that defendant was guilty. We do not agree with defendant's allegation. It appears the prosecutor was merely speaking in the first person to beseech the jury to give the State a fair trial. We do not find that, outside the summary of the evidence, the prosecutor stated he believed the defendant was guilty.

■ Defendant also states the prosecutor commented on the defendant's failure to testify. The prosecutor stated in the People's rebuttal closing:

> "This is evidence that you heard from here [indicating], and you have heard nothing from here [indicating], to say that those individuals, those three individuals were threatening the life of this defendant to the point where he had to kill them. * * *.
>
> * * * But, what you might not know about affirmative defenses,

which the self-defense is one, is that in order to talk about self-defense, you have to bring forth some evidence of it. There has to be some evidence before you in order to decide that there is self-defense. Nothing, no credible evidence of that. And remember, every one of those three people."

When the prosecutor referred to the lack of believable evidence and the lack of credible evidence, he made these statements during his rebuttal closing remarks. The defense attorney had already stated to the jury that "what he did he did in fear for his person and for his life." We find the State's remarks to have been a proper response to defendant's closing argument.

"His statement was a reply to and invited by comments which the defense counsel had previously made in his argument to the jury." *People v. Zuniga* (1973), 53 Ill. 2d 550, 558, 293 N.E.2d 595, 599.

The defendant cites *People v. Burton* (1969), 44 Ill. 2d 53, 57, 254 N.E.2d 527, 528-29, for the proposition that the prosecutor is forbidden to make a direct reference to a defendant's failure to testify.

However, in that case, the court referred to the prosecutor's statements as "direct and unequivocal." The court stated that the prosecutor's remarks were intended for no other purpose than to call the jury's attention specifically to the defendant's failure to testify. In the present case, the prosecutor referred to the lack of believable and credible evidence relating to the defense of self-defense.

We do not believe any of the remarks of which defendant complains could have affected the jury's determination in light of the evidence and testimony presented at trial. *People v. Gunner* (1979), 73 Ill. App. 3d 533, 538, 392 N.E.2d 165, 168.

We conclude the evidence of defendant's guilt was so overwhelming that the remarks made by the prosecutor in closing argument did not result in substantial prejudice to defendant.

For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

LINN, P. J., and JIGANTI, J., concur.