THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BARRY WILSON, Defendant-Appellant.

First District (2nd Division)   No. 1—90—0066

Opinion filed May 5, 1992.

Randolph N. Stone, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant, Barry Wilson, was convicted by a jury on two counts of murder and conspiracy to commit murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a), 8—2(a)) and sentenced to natural life in prison. On appeal, he identifies error in the circuit court's refusing to give a tendered defense instruction; allowing the prior consistent statement of a prosecution witness to be admitted; and permitting portions of the State's closing argument to stand. For reasons which follow, we affirm.

At trial, Jacqueline Gibons (Jacqueline) testified that she was the 20-year-old adopted daughter of the victims, Benjamin and Sybil Gibons (Benjamin and Sybil). She often spent time with defendant, regularly gave him money, and paid for meals or activities when they were together. Benjamin and Sybil did not approve of Jacqueline's friendship with defendant, and he was not welcome in their home.

In June 1982, Sybil took away Jacqueline's credit cards and checks when she discovered the dire condition of Jacqueline's finances. Defendant, angered by Sybil's interference, told Jacqueline that he was going "to do away with" her parents. In July, Sybil began meeting Jacqueline on her payday to ensure that she did not give money to defendant, as had been her previous practice.

On July 27, 1982, defendant called Jacqueline at work and told her that he had broken a window at her home. That evening, Benjamin spoke with Detective Greg McLaughlin of the Skokie police department and decided to file burglary charges against defendant. When he learned of Benjamin's intentions on the next day, defendant told Jacqueline that her parents "were going down that night."

On July 29, 1982, Jacqueline met defendant and Robert St. Pierre (Robert), whom she knew previously. Defendant said that Robert would come to her house that evening and kill her parents, but Jacqueline did not believe that he was serious.

That evening, Jacqueline and her father were at home when Robert came to the front door and rang the bell. Benjamin answered, and Jacqueline introduced the two men. When Benjamin turned away, Robert picked up a hammer which was on a bench by the door and followed him into the kitchen. Jacqueline remained in the living room and heard shuffling and hammering coming from the kitchen. Robert ordered her to call defendant; she did so and he arrived a few minutes later. Jacqueline was crying hysterically, but defendant slapped her and calmed her down. Defendant and Robert wrapped Benjamin's body in bedding and moved it into the master bedroom. Pursuant to defendant's order, Jacqueline helped clean up the blood in the kitchen.

At one point, Detective McLaughlin called by telephone to speak with Benjamin or Sybil, and Jacqueline told him that they were not home. When the phone rang, defendant had threatened to kill her if she told of the incident.

Sybil called and asked Jacqueline for a ride home; Jacqueline went to pick her up, as defendant ordered. When they got home, Sybil walked in the front door, and a hammer struck her torso; she fell into the living room. Defendant immediately took Jacqueline, who was hysterical, to another room. Defendant and Robert wrapped Sybil's body in bedding and plastic and cut out sections of the blood-soaked carpet with kitchen knives. They all left the house for the night.

While at work on the following day, Jacqueline called her parents' employers and reported that they were ill, as defendant directed. At the end of the day, defendant and Robert drove her home in the Gibonses' car. With a hammer and chisel, the two men made a hole in the wall which separated the garage and the closet adjacent to the master bedroom. They lifted the bodies through this hole and placed them in the trunk of the Gibonses' car. Defendant told Jacqueline that he was going out of State with the bodies and would maintain contact with her.

Defendant called Jacqueline on Saturday and Sunday to check on whether she had "kept her mouth shut." On Monday August 2, 1982, Jacqueline went to work and reported to her parents' employers that they were out of town. Defendant called that day and told Jacqueline to wire him money in Los Angeles, which she did. He told her that someone had answered the telephone at her parents' home when he called earlier that night. She then called her parents' house and identified herself to a policeman who answered. Ultimately, she was taken into custody and gave a formal statement to police. On cross-examination, Jacqueline testified that she pled guilty to the murder of Sybil

and conspiracy to murder Benjamin, and the remaining charges pending against her had been dropped.

Harriet Metrick, Sybil's sister, testified that on August 2, 1982, after Sybil had been absent from work for two days, she contacted the Skokie police department, and officers forcibly gained access to the Gibonses' residence. Metrick and the officers saw that sections of the living room carpet had been cut out and the walls and floors were stained with blood.

Detective McLaughlin testified that he had spoken to Benjamin and Sybil about filing burglary charges against defendant. On July 29, and again on July 31, 1982, he called to speak with Benjamin, but Jacqueline said her parents were not at home. On August 2, McLaughlin went to the Gibonses' residence. The kitchen was in disarray, large sections were cut from the living room carpet, and a pail of discolored water was in the entryway. In the master bedroom, the carpet was stained with blood and the doors had been removed from the closet. The carpet, drapes, furniture, walls, and ceiling in the living room were spattered with blood. A blood-saturated piece of carpet and several plastic bags containing bloodstained rags, newspapers, and gloves were found in the garage. A masonry dust-covered hammer lay near the hole in the garage wall. Benjamin's wallet containing vehicle registration data was found in the kitchen. A "stop and hold" order on the Gibonses' car was placed with State police. After speaking with Jacqueline later at the Skokie police station, Los Angeles and Phoenix police were alerted to defendant's potential presence in each place.

Relative to the investigation, Detective McLaughlin went to Phoenix, where defendant had been arrested and was in custody. He searched the Gibonses' car and found several receipts from gasoline purchases which had been made with Benjamin's credit cards and signed "B. Gibons." One receipt bore defendant's driver's license number. He found an accumulation of blood in the trunk. McLaughlin returned to Chicago with defendant.

Robert was arrested on August 3, 1982. The decomposing bodies of Benjamin and Sybil were found on August 10, 1982, along a roadside in Guadalupe County, New Mexico. A forensic pathologist testified that the cause of death for both victims was multiple blows to the head, consistent with those made by the round end of a hammer. The State also called an evidence technician who found defendant's palm print on the closet door in the master bedroom, the officer from the Phoenix police department who arrested defendant, and a forensic anthropologist, all of whom provided corroborating testimony.

The State rested, and defendant's motion for a directed verdict was denied. Defendant rested without presenting any evidence. As earlier noted, the jury found defendant guilty of both counts of murder and conspiracy to commit murder, and not guilty of the two armed robbery counts, and he was sentenced to natural life in prison. This appeal followed.

## I

Defendant first contends that the circuit court erred in refusing his tendered jury instruction on concealment of homicidal death, which he alleges was a lesser included offense of conspiracy to commit murder.

Defendant has waived this contention for failure to object to the circuit court's denial of his requested instruction. See *People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124.

Were we to consider defendant's argument on its merits, it would fail nevertheless. Defendant was not charged with concealment of homicidal death. The counts of the indictment charging defendant with conspiracy alleged that defendant, with others, and with the intent to commit murder, agreed to the commission of that offense and, in furtherance thereof, beat Benjamin and Sybil on the head with a hammer and removed their bodies from the residence. Concealment of homicidal death requires knowledge that a homicide has occurred and some affirmative act of concealment by defendant. (Ill. Rev. Stat. 1981, ch. 38, par. 9—3.1(a); *People v. Mueller* (1985), 109 Ill. 2d 378, 388, 488 N.E.2d 523.) Defendant is entitled, under certain circumstances, to have the jury instructed as to a lesser included offense than that with which he is charged. (*People v. LePretre* (1990), 196 Ill. App. 3d 111, 120, 552 N.E.2d 1319.) By statutory definition, concealment of homicidal death is not a lesser included offense of conspiracy to commit murder, since not all the elements of the former offense are also elements of the latter offense. (See Ill. Rev. Stat. 1981, ch. 38, par. 2—9(a); *People v. Booker* (1991), 214 Ill. App. 3d 286, 288, 573 N.E.2d 385.) The supreme court, however, has recognized that the definition does not explain which of the following is determinative in deciding whether a particular offense is an included offense of another: the abstract statutory definition of the greater crime; the greater crime as it is alleged in the indictment or charging instrument; or the greater crime as its necessary elements are proved at trial. *People v. Mays* (1982), 91 Ill. 2d 251, 255, 437 N.E.2d 633.

In *People v. Bryant* (1986), 113 Ill. 2d 497, 503-04, 499 N.E.2d 413, the supreme court, acknowledging its decision in *People v. Dace*

(1984), 104 Ill. 2d 96, 470 N.E.2d 993, looked to the language of the charging instrument and the evidence proved at trial to determine whether one offense was included within another. In *Bryant,* although defendant was charged with attempted burglary, he sought an instruction on criminal damage to property as a lesser included offense, which the court held should have been given. In limiting the included-offense doctrine, the court noted that such an instruction is appropriate only if a jury rationally could find defendant guilty of the lesser offense and acquit him of the greater, or where the charged greater offense requires the jury to find a disputed factual element which is not necessary for conviction of the lesser included offense. *Bryant,* 113 Ill. 2d at 507.

In *People v. Schmidt* (1988), 126 Ill. 2d 179, 183-84, 533 N.E.2d 898, the supreme court held that a defendant cannot be convicted of an uncharged offense which is not a lesser included offense of that charged. Subsequent cases have concluded that the rule in *Schmidt,* which was based upon a double jeopardy analysis, is determinative of whether an instruction on a lesser uncharged offense should be given. See *Booker,* 214 Ill. App. 3d at 289; *People v. Johnson* (1990), 206 Ill. App. 3d 318, 320-21, 564 N.E.2d 232.

Here, defendant was not entitled to an instruction on concealment of homicidal death. Although the indictment may have implied the elements of homicidal concealment, that lesser offense was not the obvious foundation of the charge. The cases cited by defendant which construe *Bryant* do not involve concealment of homicidal death as a possible included offense of conspiracy to commit murder and, therefore, are distinguishable. There is no evidence in the record that restricts defendant's involvement only to concealment. Further, an instruction on concealment of homicidal death would not have permitted the jury rationally to find defendant guilty of that offense but not guilty of conspiracy to commit murder; the evidence as to defendant's guilt of the greater offense was overwhelming. (See *People v. James* (1990), 200 Ill. App. 3d 380, 390-91, 558 N.E.2d 732.) The circuit court, therefore, did not err in refusing defendant's tendered instruction.

## II

Defendant next asserts that he was prejudiced when Jacqueline's prior statement was read to the jury. Defendant has waived this argument for failure to raise it in his post-trial motion. *Enoch,* 122 Ill. 2d at 186-87.

■ Even if not waived, we find defendant's argument baseless. A witness may not testify as to statements she made out of court in order to corroborate similar trial testimony; however, to rebut a charge or inference that the witness recently has been motivated to fabricate or testify falsely, evidence that she told the same story prior to any alleged motive or fabrication is admissible. (*People v. Clark* (1972), 52 Ill. 2d 374, 389, 288 N.E.2d 363.) Proof that the witness gave a similar account of the occurrence when the motive to lie was nonexistent, or before the effect of the account could be foreseen, also makes the prior consistent statement admissible. *People v. Klinkhammer* (1982), 105 Ill. App. 3d 747, 749, 434 N.E.2d 835.

Here, during cross-examination, defense counsel emphasized that in exchange for her guilty pleas to one count of murder and conspiracy to commit murder and her agreement to testify against defendant, the State was recommending a prison sentence for Jacqueline which was less severe than that which she might otherwise endure. He also asserted in closing argument that Jacqueline had a motive to lie, based upon her agreement with the State. In response, the State was allowed to introduce Jacqueline's statement into evidence to rebut the inference urged by defendant.

Defendant argues that at the time she made the statement, Jacqueline had a motive to accuse defendant falsely so that she might deflect suspicion from herself. That allegation, however, is not supported by the record. Jacqueline was charged, tried, and convicted of murder, conspiracy, armed robbery, and concealment of homicidal death. She agreed to plead guilty and testify against defendant only after new charges had been filed against her prior to the second trial.

The proffered statement was substantially similar to Jacqueline's trial testimony. The weight to be accorded the statement is a question for the jury, which is entitled to hear the entire statement and determine what credence should be given any inconsistency. (*Klinkhammer*, 105 Ill. App. 3d at 749.) The statement, therefore, was properly admitted to rebut defendant's allegations of recent fabrication by Jacqueline.

## III

Lastly, defendant contends that portions of the State's closing argument were improper. In his argument to the jury, defense counsel referred to witnesses and evidence that could have been presented by the State, suggesting that Jacqueline's testimony was not credible or corroborated due to the absence of such evidence. In response, the State argued that defense counsel also had the power to subpoena

witnesses, and "if [a witness] could say that this never happened, they could have brought her in too." Defendant's objection to the State's argument was overruled.

A prosecutor is given considerable latitude in closing argument; the circuit court's determination as to the propriety of closing argument will not be reversed absent a clear abuse of discretion. (*People v. Harris* (1990), 196 Ill. App. 3d 663, 675, 554 N.E.2d 367.) Nor may defendant claim prejudice resulting from the State's comments when they were invited by defendant's argument. *People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612.

In *People v. Holman* (1984), 103 Ill. 2d 133, 151, 469 N.E.2d 119, after reciting the general proposition that the State may not comment unfavorably upon a defendant's failure to produce witnesses, the supreme court held that comment on the failure of a potential defense witness to testify is permitted when made in response to defense counsel's own reference to the State's failure to call the witness. The court found that the prosecutor's response to comments, similar to those made in this case, was not prejudicial. The State did not dwell on defendant's failure to produce the witness, and the prosecutor's remarks were intended to rebut the inference that the State's case would have been compromised by appearance of the witness. *Holman*, 103 Ill. 2d at 151-52.

■■ Similarly, the State's remarks in this case rebutted defense counsel's reference to the absence of potential witnesses. In such an instance, it is not erroneous to remind the jurors of the power of compulsory process. (See *People v. Mahaffey* (1989), 128 Ill. 2d 388, 425, 539 N.E.2d 1172; *Richardson*, 123 Ill. 2d at 355.) The absence of the remarks would not have resulted in a different verdict (see *People v. Henderson* (1990), 142 Ill. 2d 258, 323, 568 N.E.2d 1234), and any error was harmless in light of the court's subsequent instruction that argument was not evidence and any argument not based on the evidence should be disregarded (*People v. Scott* (1990), 194 Ill. App. 3d 634, 645, 551 N.E.2d 288).

Second, defendant challenges the State's remark, his objection to which was overruled, that the jury could not assume absent witnesses would testify contrary to the State. He argues that a party's failure to introduce evidence which would settle conclusively a doubtful issue gives rise to a presumption that the evidence, if produced, would be adverse to that party. That assertion, however, is based upon the holding in *People v. Strong* (1961), 21 Ill. 2d 320, 172 N.E.2d 765, which has been limited to cases involving the defense of entrapment. (See *People v. Ayala* (1990), 208 Ill. App. 3d 586, 596, 567 N.E.2d 450.)

Further, an absent witness must have testimony unique to the case for the negative inference to arise. See *People v. Zenner* (1980), 84 Ill. App. 3d 566, 571-72, 406 N.E.2d 27; *People v. DeSavieu* (1973), 11 Ill. App. 3d 529, 534, 297 N.E.2d 336.

■ Here, the absent witness referred to was a friend to whom Jacqueline had spoken before she surrendered herself to the police. There is no indication in the record or allegation by defendant that the witness would have provided testimony unique to the case. The State's remarks were invited by defense counsel, who suggested that the State was withholding witnesses with unfavorable testimony. (See *Richardson*, 123 Ill. 2d at 355-56.) The circuit court did not abuse its discretion in allowing the State to make the contested remark.

Based upon the foregoing, the judgment of the circuit court must be affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.