THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN WILLIAMS, Defendant-Appellant.

First District (2nd Division)   No. 1—92—0953

Opinion filed May 10, 1994.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Lou Anne Corey, Sang Won Shim, and Jason H. Payne, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Following a joint bench trial with two others, defendant Kevin Williams was found guilty of first degree murder, attempted murder, aggravated battery with a firearm, aggravated battery, aggravated discharge of a firearm, and aggravated unlawful restraint. He was sentenced to a term of natural life imprisonment for murder, with concurrent terms of 30 years and 10 years for the lesser offenses. Defendant appeals, raising issues of improper admission of evidence, violation of discovery rules, and ineffective assistance of counsel. For reasons that follow, we affirm.

During defendant's joint trial with codefendants Ira Hines and Reginald Lee, the following evidence was adduced.

Marsha Robertson testified that the victim, Harry Sain, was the father of her two children. The children lived with Sain, his mother Josephine Sain, and his sister Shirley Sain, at 844 South Racine in apartment 838, a first-floor apartment in a three-story apartment building known as the Jane Adams Projects or Hablo Homes.

On February 18, 1991, at about 1:15 a.m., Robertson and Sain left Camilla Dicken's house on Lytle Street, a block away from Racine, and began walking to Sain's apartment. When they were about half a block from their destination, Robertson saw four "dudes" approaching them. She recognized them as four men from the neighborhood known as Thunder, Fruitie, Reggie Lee, and West; they had nothing on their faces to hide their identities. At the time, Robertson did not know the real names of Thunder, Fruitie, or West, but she knew that Reggie Lee was Reginald Lee. She made an in-court identification of Fruitie as defendant, Thunder as codefendant Ira Hines, and Reggie Lee as codefendant Reginald Lee.

Robertson noticed that defendant, Thunder, and Reggie Lee each had a gun. She told Sain that the men had guns and that he should

go and open the apartment door. Just before Sain and Robertson reached the entrance of Sain's apartment building, as the four men were close to them, Robertson said, "Hi, Thunder," trying to delay him while Sain entered the apartment. Thunder then told defendant to place her "under arrest." Defendant, who had a "Tech-9" gun in his hand, grabbed her collar and pushed her against the wall inside the entryway, across from the mailboxes. Reggie Lee was upstairs with Sain, who was trying to get into his apartment; West was standing on the outside of the doorway. Thunder then went upstairs to where Sain was. Robertson could not see what was happening upstairs, but heard Sain asking what was wrong and pleading with the men not to hurt them.

Thunder then asked Robertson, "Where's A.K. and Mark?" She told him that she and A.K., her boyfriend, were no longer together. Mark is her cousin. She knew where they were, but she did not tell Thunder. A.K. belonged to the El Rukn street gang, which did not operate in the area of 844 South Racine. Defendant and Thunder belonged to the Black Gangsters of the Disciples street gang, who "hung out" in the area. The two gangs were not friendly. Defendant and his codefendants were looking for A.K. and Mark because A.K. and the codefendants sold drugs.

When Robertson did not tell Thunder where A.K. and Mark were, Thunder walked up and down the stairs, never staying in one place. Defendant repeatedly asked Thunder whether Thunder wanted him to "do it now," but Thunder kept saying "no." Thunder walked down the stairs, and defendant asked again. When Sain started to walk down the stairs, Thunder said "yes." Defendant then began shooting at Sain, firing seven or eight times. After shooting Sain, defendant asked Thunder whether he should shoot Robertson. Thunder said "yeah," and defendant turned toward her and fired at her head twice. Thunder also shot at Sain twice, after he was already down. Defendant and Thunder ran away, and West was gone as well. Robertson was not sure whether she was shot; she merely felt a burning sensation on the left side of her forehead. She blacked out and, when she came to, Reggie Lee, who had been at the top of the stairs during the shooting, was running down the stairs with a gun in his hand. Robertson grabbed him and begged him not to kill her. Reggie Lee said, "Bitch, get down," pushed her away, and ran out. Sain, who was on the stairs, called Robertson's name, and then "went out."

Robertson ran up the stairs and began banging on the door to Sain's apartment. Sain's mother answered the door, and Robertson told her that defendant and Thunder had just shot Sain. Robertson then called the police. When they arrived, she told them what

happened and said defendant, Thunder, Gus (Reggie Lee's brother), and West shot Sain. Robertson incorrectly named Gus because she was shaken up and talking fast. She corrected herself and named Reggie Lee later, when she went to the police station. She had burns on her face from being shot at, but she did not go to the hospital; instead, she went to the police station and talked to the detectives.

Robertson told the detectives that defendant, Thunder, Reggie Lee, and West were the offenders. About two hours after the shooting, she viewed photographs and recognized Thunder's picture. On February 21, 1991, she was asked to view more photographs, and she recognized photographs of defendant and Reggie Lee. Robertson was also interviewed by an assistant State's Attorney; afterwards, her statement was put in writing and she signed it. In May 1991, she testified before the grand jury concerning the shooting incident. She was afraid of West and of the entire neighborhood when she testified before the grand jury; subsequently, she did not continue to live at her house, but stayed in hotels paid for by the State.

On the morning of June 25, 1991, Robertson was visiting her sister at 1239 South Racine. At about 10 a.m., two men came to her sister's house and knocked on the door. They asked Robertson to come with them in order to sign a statement. The men told her that "it wouldn't cost nothing but 55 cents for a bullet to go into one of [your] heads," referring to her and her family. They then drove Robertson downtown to an office. On the way, the men told her that they wanted her to say that the offenders wore ski masks during the incident and that she was high on heroin at the time. They also told her to say that she named the codefendants because she was mad that they had previously kidnapped A.K., who in fact had been kidnapped on December 19 by Thunder and a person named Cassadine, who was then dead.

Robertson and the men arrived at an office building, the location of which she did not remember, at 11 a.m. or noon. After parking, they all went upstairs. The men went inside the office while Robertson remained in the waiting room. The men came out about 15 minutes later, and Robertson went inside without them. Thunder's attorney, Mr. Vilkelis, introduced himself to her. He asked her where she lived, how many children she had, and about her sister and other personal things. She told him she lived at 1239 South Racine, although she did not. A court reporter arrived about 5 to 10 minutes later. Robertson then gave a statement, lying and saying what the men wanted her to say because she was afraid for herself and her family. There was nobody else present except for Vilkelis, the court reporter, and another attorney. She did not immediately sign the

statement after it was taken. Vilkelis told her that he would be in touch in a few weeks, although he did not ask for her telephone number. Robertson left, and the two men, who were waiting for her, drove her back to her sister's house.

On August 28, 1991, Robertson was on Lytle Street with Camilla and A.K. when two men drove up. One of them was one of the men who had previously driven her to the downtown office, and the other was a stranger. Robertson got into their car and went with them back to the downtown office. She went into the office, looked over the statement she had previously made, and signed it, making no corrections or changes. She signed it because she was afraid for herself and her family, and because she was afraid of people in the neighborhood and of West. Another man then entered the office and took two photographs of her. She walked into the hallway and a woman, who was not present when Robertson signed the statement, also signed it. The two men then drove her back to where they had picked her up. Prior to that day, Robertson had known that someone was looking for her to sign the statement.

On cross-examination, Robertson testified that A.K. had sat in the courtroom "for about a second" during her testimony, but had left before she mentioned his name. She was not employed and supported herself through General Assistance. She did not support any of her five children. She received between $500 and $600 from the State for living expenses, staying in several hotels over a four- to six-month period. The State paid the money directly to the hotels, not to her; when she needed money for personal things, she called the State. During the time she was housed by the State, she did not receive General Assistance because she failed to keep her appointments and the aid was cancelled.

Robertson had used heroin "every now and then" for the past year or year and a half. She was not an addict, and used heroin only when she was out socializing with friends. When she used heroin, she would use it twice a day. She had used her General Assistance money to purchase heroin. She had not used the money given to her by the State to purchase heroin because she did not know where to buy it in the areas where she stayed in the hotels.

She had last used heroin two days before she testified. She had used heroin on the day before the incident but not on the day or night of the incident; on that day, she stayed inside all day, "watching TV, just laying around." She went to Sain's apartment to check on her baby, who was asthmatic. Generally, after Robertson saw her baby she would get high on heroin, but not in Sain's apartment. When she got home after the shooting incident, she did not use heroin because she was too upset.

On May 8, 1991, Robertson was arrested for bringing drugs, about one-half gram of heroin, into the jail when she went to visit A.K. She had been told to pick up clothes from A.K.'s mother's house, and the drugs were already in the clothes. She remained in jail for 12 days. After eight days, she testified before the grand jury. She did not speak to anyone from the State's Attorney's office while she was in jail until the day she testified before the grand jury. She was offered no deal to testify. Her drug case was dismissed when she went to court because the police officers who caught her did not show up. Robertson did not talk to any assistant State's Attorneys before the dismissal. When she went to court, she was free on an "I-bond." A.K. remained in jail for a month or two after Robertson testified before the grand jury. She had been dating him for a year and a half and knew that he was on parole for murder. She had never been convicted of any crime.

Robertson had been driven to Vilkelis' office by two men in a gray, four-door car. She sat in the front seat by the driver while the other man, a dark-skinned black man, sat in the back seat. Robertson had seen him before in the neighborhood but did not know his name. She did not remember how tall he was or how much he weighed. The driver was also dark-skinned, about 6 feet 10 inches tall and "heavy weighted." She did not describe the men to anyone at the State's Attorney's office. Nobody gave her Vilkelis' business card.

She guessed that the shooting incident lasted about 30 to 45 minutes from the time she saw the codefendants until it was over. Defendant fired at her twice, first three to four inches from her head, the bullet entering the door above her head. She was unsure whether the second shot was fired at her head. After calling the police, Robertson called her friend Beeca and told her who had shot Sain. Beeca told her that Thunder's real name was Ira Hines.

When Thunder asked Robertson where A.K. and Mark were, he was referring to Mark Dickens, her cousin. Mark and A.K. grew up together, but were not in the same gang. Thunder did not say why he wanted to see A.K. and Mark. While defendant held her against the wall, she repeatedly shouted Thunder's name and asked him what was going on. Defendant told her to stop yelling Thunder's name and, when she did not, he hit her on the head with his gun.

Robertson talked to the police in the kitchen of Sain's apartment. She did not remember giving the police a description of Thunder or Gus, but did remember giving a description of West. She also believed she may have given a description of defendant. She then spoke to Detectives McGreal and Bronsberg at the police station and gave them the names of the offenders. Robertson said that defendant's

name was David, because defendant was seeing Robertson's cousin Camilla at the time, and David was the father of Camilla's children. The police brought her to Camilla's house, where she told Camilla that defendant shot Sain. The police asked Camilla if she knew where defendant was, and Camilla responded that she did not. She showed the police a picture of defendant, however.

Chicago police officer John Butler testified that he was assigned to the mobile crime lab unit. On February 18, 1991, at 1:25 a.m., he was assigned to investigate the crime scene at the apartment building located at 844 South Racine. He recovered three fired bullets and a nine-millimeter cartridge casing from the ground level of the foyer, and a fourth fired bullet from the first-floor landing, in front of apartment 836. He also observed two indentations in the mailbox area, both of which appeared to have been caused by bullets.

Chicago police officer David Kozek testified that on February 18, 1991, at about 1:20 a.m. he received an assignment of a man shot at 844 South Racine. He arrived on the scene about two minutes after receiving the call and observed the victim lying face-up on the stairs with his feet on the foyer floor. Kozek spoke to Robertson on the landing and inside the apartment. Robertson told him that defendant, Thunder, Gus, and West were the offenders. She also gave him a description of them.

Detective Thomas McGreal testified that he and his partner, Detective Bronsberg, became involved in the homicide investigation. McGreal spoke to Robertson at Area Four Headquarters between 2:30 a.m. and 3 a.m. on February 18, 1991. She had powder burn injuries on the left side of her forehead. She told him the same story she had testified to, up to the point of the interview. McGreal's conversation with Robertson took place about 1 hour and 40 minutes after the incident.

McGreal showed Robertson a police department photo book, and Robertson pointed to Thunder's photograph. Three days later, on February 21, 1991, McGreal showed her another photo array, and she pointed out photos of defendant and Reggie Lee.

On cross-examination, McGreal testified that he did not remember Robertson telling him that one of the offenders hit her with a gun, or that one of the offenders asked her, "Where's A.K. or Mark." Robertson never told the detective that the incident took 45 minutes, that defendant's name was David, or that the gun was a "Tech-9."

McGreal interviewed Mary Hoard at the scene. She told him that she heard six or seven shots, looked out her window, and observed two black men running westbound from the entrance to 844 South Racine. They ran to the end of the project building, then north to an

unknown destination. Hoard told him that she could not identify the men. McGreal also interviewed Ronald Wilson at the scene. Neither Wilson nor Hoard described the men that were fleeing the doorway as wearing ski masks.

Josephine Sain testified that she was Sain's mother. She was living at 844 South Racine with Sain, his two children, and her daughter Shirley. Mrs. Sain testified that Sain was 27 years old on February 18, 1991. She last saw him at 4 p.m. on the afternoon of the shooting. He was in a very good mood and told her that he was going to the Boy's Club to play ball and that he would be home that night. She identified two photographs of him, one taken before he was shot and one taken after.

During the early morning hours of February 18, 1991, Mrs. Sain was watching television in her bedroom when she heard five or six gunshots coming from the hallway area. Shirley was asleep in her bedroom at the time. The Sains' apartment was not on ground level; one had to climb four or five steps to reach it. The apartment was the first to the left of the stairway. After hearing the gunshots, Mrs. Sain got up and listened. She heard Robertson screaming and pounding on the apartment door. Robertson was hysterical and screaming, "They're shooting up Harry!" Mrs. Sain opened the door and saw Sain on the stairs with a bullet hole through his neck. Robertson told her that defendant and Thunder shot him, then called the police and an ambulance. Mrs. Sain identified a photograph of Robertson, which showed the injury to Robertson's head.

Shirley Sain testified that she was awakened by the loud gunfire. Robertson told Shirley that defendant and Thunder shot her brother.

Chicago police officer Thomas Newton testified that at 7:30 p.m. on April 26, 1991, he observed a gray automobile traveling southbound on Wood Street. He recognized defendant as the driver. Newton stopped the vehicle and placed defendant under arrest. He recovered a 12-gauge shotgun from the trunk, and a nine-millimeter Lueger from underneath the driver's side dashboard. The parties stipulated that the nine-millimeter Lueger did not fire any of the bullets recovered from the scene.

The parties also stipulated that Dr. Robert Kirschner conducted a post-mortem examination of Sain on February 18, 1991. He observed seven gunshot wounds on Sain's body. His opinion was that Sain died of multiple gunshot wounds to the body. The parties further stipulated that analytic tests were performed on the four fired bullets and one cartridge casing recovered from the scene, and on the one bullet recovered from Sain's body. The tests indicated that at least two nine-millimeter weapons were fired.

With the introduction of the exhibits, the State rested. Defendant moved for a finding of acquittal at the close of the State's case, and the court denied the motion.

Mary Hoard testified for the defense that she lived at 906 South Racine. On February 18, 1991, Hoard was in her apartment when she heard about six gunshots. She lay down on the floor and remained there for about 10 minutes. She did not look out the window, nor did she observe anything. She later went outside, where she spoke with a detective. She told the detective that she heard five or six gunshots and also heard a woman yelling, "Missing." Hoard denied telling him that she heard six or seven shots, then looked out her front window and saw two men running west from the entrance to 844 South Racine to the end of the project building, then north.

Dr. Robert Kirschner testified that he viewed a photograph of Marsha Robertson which showed an injury to her forehead. Robertson's wound was consistent with stippling from a close-range gunshot wound, fired from about three to six inches away. Kirschner found it troublesome that Robertson had no bullet wound in the central portion of the stippling. The amount of stippling was not the amount he would expect to see from a nine-millimeter cartridge fired at that distance. The stippling pattern wound would not have been as circular if the weapon was fired across Robertson's forehead, or fired so that the bullet traveled past her head. The pattern was indicative of a blank round fired at her with less powder than a normal nine-millimeter round.

Kirschner's explanation of Robertson's injury was that a not fully functional nine-millimeter cartridge was fired at her. If there had been a bullet, there would have been at least a bruise or dent in Robertson's head. On cross-examination, Kirschner agreed that it would be fair to say that the injury to Robertson's head was absolutely stippling from gunfire from close range. A misfired gun could have caused the exact amount of stippling that was found on Robertson's forehead.

Robert Callahan testified that he photographed the scene two days before testifying. He searched for bullet holes in the walls and doors. The graffiti was the same as that shown in the police photographs.

The parties stipulated that, if called, Ronald Wilson would have testified that he was in his apartment at 906 South Racine when he heard eight gunshots. He looked out his front window and saw one black man standing at the entrance to 844 South Racine and shooting into the building. The man then ran to the west end of the building, then north to an unknown destination. A short time later, Wilson

observed a gray-colored 1978 Chevrolet traveling east from Lytle Street through the parking lot, then turn north in the same direction as the running man. The vehicle returned a short while later and was traveling the wrong way on a one-way street.

Marvin Bloom testified that he was a lawyer and that his office was in the same suite as Vilkelis' office. Vilkelis asked him to witness Marsha Robertson's statement on June 25, 1991, and he did so. Present in the office were Bloom, Vilkelis, the court reporter, and Robertson. Robertson did not appear to be nervous or under any stress when she gave her statement. Bloom returned to his office after the statement and did not notice anyone unusual or suspicious around the suite. Robertson and the court reporter were already in Vilkelis' office when he arrived, and he had no idea when they left. Bloom did not know with whom she arrived or with whom she left.

Terry Cornell testified that he was a private investigator and that he was in Vilkelis' office on August 25, 1991. He observed Robertson sign something in Vilkelis' office. He took a photograph of Robertson after the signature. The three then went to Vilkelis' secretary, who notarized Robertson's signature. Cornell saw nobody on the floor because he came from the offices next door. Robertson was already in the office when he arrived, and he rode down the elevator with her alone. He did not know how she got home.

The parties stipulated that Robertson was moved on three different occasions from three different hotel facilities, and that approximately $6,800 was spent by the State in keeping her in those locations. The parties also stipulated that about $500 was given directly to Robertson. The defense then rested.

Following closing arguments, the court found defendant guilty of first degree murder, attempted murder, aggravated battery with a firearm, aggravated battery, aggravated discharge of a firearm, and aggravated unlawful restraint. Defendant moved for a new trial, which the court denied. The court sentenced defendant to natural life in the custody of the Illinois Department of Corrections for first degree murder, 30 years for attempted murder, 30 years for aggravated battery with a firearm, 10 years for aggravated battery, and 10 years for aggravated unlawful restraint, the sentences to be served concurrently. Defendant now appeals.

## I

Defendant first asserts that the evidence of gang affiliation admitted through the testimony of Robertson was unfounded and irrelevant, and that its admission denied defendant a fair trial. The State responds that the evidence was relevant to prove motive and was thus properly admitted.

Evidence is admissible if it is relevant to an issue in dispute and if its probative value is not substantially outweighed by its prejudicial effect. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 487, 568 N.E.2d 864.) Evidence is relevant if it tends to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence. (*People v. Eyler* (1989), 133 Ill. 2d 173, 217, 549 N.E.2d 268, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 174, 111 S. Ct. 215.) It is the function of the circuit court to weigh the probative value and prejudicial effect of the evidence in determining whether it should be admitted. (*People v. Shum* (1987), 117 Ill. 2d 317, 353, 512 N.E.2d 1183, *cert. denied sub nom. Shurn v. Illinois* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060.) Evidentiary rulings will not be overturned on appeal unless a clear abuse of discretion is shown. *Shum*, 117 Ill. 2d at 353.

Gang-related evidence will not be excluded if it is otherwise relevant and admissible. (*Gonzalez*, 142 Ill. 2d at 489.) Proof of gang affiliation or membership is admissible if such membership or affiliation is related to the crime charged. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.) Such evidence is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900; *People v. Nichols* (1992), 235 Ill. App. 3d 499, 505-06, 601 N.E.2d 1217, *appeal denied* (1993), 148 Ill. 2d 649, 610 N.E.2d 1271; *People v. Campbell* (1992), 232 Ill. App. 3d 597, 600, 597 N.E.2d 820, *appeal denied* (1992), 146 Ill. 2d 635, 602 N.E.2d 460.) Further, proof of motive is always relevant in a criminal prosecution to show that a defendant committed the offense charged. *People v. Wadley* (1988), 169 Ill. App. 3d 1036, 1044, 523 N.E.2d 1249, *appeal denied* (1988), 122 Ill. 2d 591, 530 N.E.2d 261.

In order to be admissible as evidence of motive, gang evidence must show both that the defendant is a member of a gang, and that gang activity is related to the crime charged. (*Smith*, 141 Ill. 2d at 58-60.) Defendant argues that in this case, the State's evidence failed to show either necessary factor.

The only evidence of gang affiliation came from witness Marsha Robertson. She testified that A.K., her boyfriend, belonged to the El Rukn street gang, and that defendant and Thunder belonged to a rival gang. She further testified that A.K. sold drugs for a living, and that defendant and his codefendants were looking for A.K. because they also sold drugs. Defendant made general objections to the admission of this evidence, but the court overruled most of these.

According to defendant, this evidence amounts to a conclusory al-

legation on Robertson's part, insufficient to establish defendant's gang membership. A witness may testify only to facts within the witness' own personal knowledge, without drawing inferences or making conclusions. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) The State can demonstrate gang membership through a defendant's own admission (*People v. Lucas* (1992), 151 Ill. 2d 461, 603 N.E.2d 460); through evidence that the defendant shouted a gang slogan before shooting (*People v. Silva* (1992), 231 Ill. App. 3d 127, 595 N.E.2d 1285, *appeal denied* (1992), 146 Ill. 2d 647, 602 N.E.2d 471); or through expert testimony from a police officer specializing in gang crimes, where the basis of the officer's assertion is presented to the fact finder (*People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671). The bare assertion of a lay witness regarding gang membership, however, is not adequate. *Lucas*, 151 Ill. 2d at 479.

■ Although here defendant challenges the admission of the gang membership evidence on the basis of its foundation, at trial and in his post-trial motion his objection was merely to the relevance of the evidence. Defendant admitted during oral argument in this appeal that the trial objection was on the basis of relevance. Any objection to the foundational basis of the evidence was therefore waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

Nor is this issue reviewable under the plain error exception to the waiver doctrine. The exception is codified in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which allows for review of errors not previously raised but which affect substantial rights. Relief from such errors is granted when serious injustices have been done to a defendant, or where the error is of such magnitude that it has denied the accused a fair and impartial trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233.) There have been no such serious injustices or errors of such magnitude in this case.

Further, the evidence of gang membership was clearly relevant to the issue of motive. Although there is nothing in the record to point to any motive for the murder of Sain, defendant and his codefendants were on the street, armed, looking for A.K. The evidence of gang affiliation provides the motive for this search. Since the murder of Sain and the attempted murder of Robertson were apparently by-products of the search for A.K., the evidence of gang affiliation provides a motive for the otherwise inexplicable acts. Because defendant waived the issue of the foundational basis for the evidence of gang affiliation, and because that evidence was relevant, it was properly admitted.

## II

Defendant next asserts that it was prejudicial error to admit testimony about two weapons found in defendant's car at the time of his arrest where stipulated ballistics evidence showed that the weapons were not fired in the crimes charged. The State responds that the evidence was admissible as a detail of defendant's arrest.

As a general rule, a weapon found in a defendant's possession may be admitted only where it has some connection to the charged offense. (*People v. Ostrand* (1966), 35 Ill. 2d 520, 525-26, 221 N.E.2d 499, *overruled on other grounds by People v. Bracey* (1972), 51 Ill. 2d 514, 283 N.E.2d 685.) In *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200, the Illinois Supreme Court articulated the standard rule in Illinois, that physical evidence is admissible if there is proof to connect it to the defendant and to the crime charged. If either connection is missing, the evidence may not be admitted. (*Free*, 94 Ill. 2d at 415.) It is enough, however, if the physical evidence is suitable for the commission of the crime. *Free*, 94 Ill. 2d at 415.

In this case, police officer Thomas Newton testified that he arrested defendant at about 7:30 p.m. on April 26, 1991. When he searched defendant's vehicle subsequent to the arrest, Newton recovered a 12-gauge shotgun from the trunk and a nine-millimeter Lueger pistol from underneath the driver's side dashboard. The two guns were not admitted into evidence at the trial, but testimony about them was allowed over defense objections.

Defendant argues that *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, supports his contention that the testimony concerning the two guns was improper. Rather than "a strikingly similar case," however, as defendant argues, *Wade* is distinctly dissimilar to this case. In *Wade*, when the defendant was arrested, he was found with a .357 magnum, which was not the gun used in the shooting in that case. The prosecutor elicited extensive testimony about the gun from the arresting officer. The officer not only testified that the gun was fully loaded and was concealed in the defendant's clothing, but also that, in his opinion, a shot from the weapon would pierce a car's bumper. (*Wade*, 51 Ill. App. 3d at 723.) In this case, defendant was tried by the court, while in *Wade* there was a jury. Further, in this case there was not extensive testimony about the guns; the officer's testimony related only to defendant's arrest. Finally, in *Wade* there was only one gun used; in this case, there were three and fired bullets from only two were recovered. The *Wade* court's holding that a gun cannot be admissible as a weapon suitable for the commission of a murder, where the State "knows and concedes that ballistic tests

show that it was not the weapon used" (*Wade*, 51 Ill. App. 3d at 729), is not persuasive here.

■ Testimony concerning the discovery of the guns in this case was arguably allowable because they were found at the time of defendant's arrest and, therefore, constitute an admissible detail of the arrest. (*People v. Le Bron* (1980), 83 Ill. App. 3d 598, 603, 404 N.E.2d 540; *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 882, 320 N.E.2d 529.) Nevertheless, Robertson had testified that three of the offenders had guns. Even though the handgun found in defendant's car at the time of his arrest was not either of the weapons that fired the bullets recovered at the scene, it still might have been the third weapon Robertson saw. It was thus, at a minimum, suitable for the commission of the crime. Testimony concerning the finding of the gun, then, was relevant and admissible. As for the testimony concerning the shotgun, there is no basis for concluding that its introduction prejudiced defendant or that its exclusion would have led to a different result. *People v. Taylor* (1984), 101 Ill. 2d 508, 517, 463 N.E.2d 705, *cert. denied* (1984), 469 U.S. 866, 88 L. Ed. 2d 140, 105 S. Ct. 209.

## III

Defendant next asserts that the admission of Marsha Robertson's grand jury testimony naming defendant as one of the offenders, and her statement to Officer McGreal to the same effect, amounted to error which denied defendant a fair trial. The State responds that defendant waived this issue by failing to object at trial and by failing to raise the issue in a post-trial motion.

Issues not raised in the circuit court are generally considered waived on appeal and cannot be raised as grounds for reversal on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) To preserve an issue for appeal, both a trial objection and a written post-trial motion are required. (*Enoch*, 122 Ill. 2d at 187.) Failure to raise an issue in the written motion for a new trial results in a waiver of that issue on appeal in the absence of plain error. (*Enoch*, 122 Ill. 2d at 198.) The question of whether a defendant is prejudiced by the reading of a witness' prior consistent statement is waived if the issue is not raised in a post-trial motion. *People v. Wilson* (1992), 229 Ill. App. 3d 80, 86, 593 N.E.2d 791, *appeal denied* (1992), 146 Ill. 2d 650, 602 N.E.2d 474.

■ In this case, defendant neither objected at trial to the admission of Robertson's grand jury testimony (although codefendants objected) nor raised the issue in his post-trial motion. As to Robert-

son's statement to Officer McGreal, the only objection came from a codefendant, and defendant again neglected to include the issue in his post-trial motion.

Nor is this issue reviewable under the plain error exception to the waiver doctrine. As indicated above, this exception is codified in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which allows for review of errors not previously raised but which affect substantial rights. Relief from such errors is granted when serious injustices have been done to a defendant, or where the error is of such magnitude that it has denied the accused a fair and impartial trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233.) There have been no such serious injustices or errors of such magnitude in this case. This issue is waived.

Moreover, if this issue had been properly preserved, given the defense theory here that Robertson's recantation testimony was more reliable than her trial testimony, her prior consistent statements were admissible to rebut the assertion of recent fabrication. *People v. Titone* (1986), 115 Ill. 2d 413, 423, 505 N.E.2d 300, *cert. denied* (1987), 484 U.S. 873, 98 L. Ed. 2d 162, 108 S. Ct. 210.

IV

Defendant next asserts that the State's failure to inform defense counsel that its witness claimed to have recanted because she was threatened by associates of defendant violated applicable discovery rules and denied defendant a fair trial. The State responds that purely oral statements of witnesses need not be disclosed pursuant to Illinois discovery rules, and that defense counsel's failure to interview the witness was not attributable to the State.

Illinois Supreme Court Rule 412(a)(i) provides as follows:

"412. Disclosure to Accused.

(a) *** [T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements." 134 Ill. 2d R. 412(a)(1).

Courts have interpreted this to mean that the State is required to disclose a witness' oral statements only if they are reduced to writing and are in the witness' own words or substantially verbatim. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 418, 539 N.E.2d 1172, *cert. denied* (1989), 493 U.S. 873, 107 L. Ed. 2d 156, 110 S. Ct. 203.) If a statement

is never memorialized, it need never be disclosed to defense counsel, absent bad faith on the State's part. *Mahaffey*, 128 Ill. 2d at 419.

Where the State's failure to reduce a statement to writing amounts to an intentional tactic to surprise a defendant at trial, the State has violated discovery. (*People v. Szabo* (1983), 94 Ill. 2d 327, 348, 447 N.E.2d 193.) Defendant argues that this is the case here, since much of the defense was devoted to challenging Robertson's testimony about the men who allegedly transported her twice to the office of codefendant's attorney and who forced her to sign a false recantation. Defendant's theory was that Robertson's recantation was true and that she invented the men in order to justify her recantation to the State's Attorney's office, which had paid her $6,800 in relocation money. The prosecutor's conscious tactic of withholding her statements from the defense until trial, according to defendant, prevented adequate investigation of their truth.

Defendant had filed a motion for additional discovery on September 20, 1991, a month before trial, requesting summaries of statements made by Robertson to police or the State's Attorney's office since the initial discovery request. Robertson claimed at trial that she had told Barry Jackson, an employee of the State's Attorney's relocation program, about the alleged threats and her trips to codefendant's attorney's office. These communications were never disclosed prior to trial, nor was the name of Barry Jackson or any of the alleged witnesses to the threats tendered to defendant in discovery.

There has been no showing, however, that a written report concerning this matter was ever made. Nor has there been a showing that the State intentionally prevented such a report from being made, in an attempt to surprise defendant at trial. Under *Mahaffey* and *Szabo*, then, there has been no discovery violation in this case.

## V

Defendant finally asserts, in a supplemental brief, that his trial counsel was ineffective when she failed to request a continuance or move for a mistrial upon learning that a prosecution witness had implicated a codefendant's attorney in an intimidation scheme. The State responds that this was a matter of sound trial strategy and that defendant's counsel was effective or, in the alternative, that defendant was not harmed by the ineffectiveness.

Prosecution witness Marsha Robertson acknowledged at trial having signed a sworn statement retracting her accusation of defendant as the offender. During opening statement, defendant learned for the first time that Robertson claimed to have retracted her

accusation only because she and her family had been threatened by "associates of *** defendants." Defendant asserts that it was decisively important to his defense to rebut the intimidation claim or at least dissociate defendant from it.

Defense counsel objected but did not request a continuance, a mistrial, or a severance after learning of the State's theory. Defendant argues that counsel should have done so, since intimidation of a witness demonstrates a consciousness of guilt (*People v. Barrow* (1989), 133 Ill. 2d 226, 261, 549 N.E.2d 240, *cert. denied* (1990), 497 U.S. 1011, 111 L. Ed. 2d 767, 110 S. Ct. 3257) and defendant's association with codefendant spreads the inference of guilt to him.

Counsel is ineffective when, in light of all the circumstances, his or her acts or omissions are outside the range of reasonable professional assistance. In addition, defendant must show there is a reasonable probability that, but for counsel's errors, the outcome would have been different. (*Strickland v. Washington* (1984), 466 U.S. 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) The burden is on the defendant to establish both his trial counsel's incompetence and the resultant prejudice. (*People v. Rodriguez* (1983), 117 Ill. App. 3d 761, 764, 454 N.E.2d 13.) This court need not determine whether counsel's performance was deficient before examining the prejudice suffered by defendant as a result of the alleged deficiencies. (*Albanese*, 104 Ill. 2d at 527.) In fact, this court should dispose of the entire claim of ineffective assistance of counsel based on the lack of sufficient prejudice if it is easier to do so. *People v. Sanders* (1991), 209 Ill. App. 3d 366, 376, 568 N.E.2d 200, *appeal denied* (1991), 139 Ill. 2d 602, 575 N.E.2d 921.

■ Here, defendant has failed the prejudice prong of the *Strickland* test: he has failed to establish that there is a reasonable probability that, but for counsel's errors, the outcome would have been different. Defendant asserts that, without the evidence of intimidation, the court would likely have believed Robertson's retraction, rather than her trial testimony. Such an assertion, however, falls far short of demonstrating a reasonable probability that the outcome would have been different.

The evidence in this case is not close, despite defendant's careful characterization of that point. Eyewitness testimony was found credible by the trier of fact, and nothing balances this evidence except innuendos about Robertson's boyfriend. The judge found Robertson's recantation to be false and her trial testimony to be credible. There is virtually no likelihood that a continuance or a severance would have enabled the defense to discredit the evidence. Defendant was

fully prepared to call witnesses to rebut Robertson's testimony, and he did so. The defense did as well as it possibly could and still failed completely.

Additionally, a severance or a mistrial would not have been granted in this case even if defendant had requested one. The two grounds for severance are: (1) when a codefendant has made hearsay admissions which implicate the defendant; and (2) when the defenses of the various codefendants are so antagonistic that a severance is imperative to assure a fair trial. (*People v. Harris* (1990), 198 Ill. App. 3d 1002, 1008, 556 N.E.2d 709.) Neither of these grounds existed in this case. A mistrial should be declared only in cases where there is an occurrence of such character and magnitude as to deprive a party of a fair trial. (*People v. Jackson* (1991), 223 Ill. App. 3d 1045, 1051, 586 N.E.2d 341.) In this case, there was no such occurrence. If defense counsel had moved for a severance or a mistrial, the circuit court would have denied the request.

Since defendant's claim of ineffective assistance of counsel fails the second prong of the *Strickland* test, this court declines his suggestion that his convictions be reversed and a new trial ordered because of ineffective assistance of counsel.

For all of these reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and McCORMICK, JJ., concur.