2023 IL App (2d) 220415-U
No. 2-22-0415
Order filed November 21, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 20-CF-252 |
| | ) | 20-CM-378 |
| | ) | |
| ROBERT BARWICKI, | ) | Honorable |
| | ) | Jody P. Gleason, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) Regardless of whether the trial court erred in admitting evidence of defendant's aggression toward third parties following the charged domestic-violence incident, plain-error review was not appropriate because defendant met neither prong of the doctrine (nor did he show prejudice from his trial attorney's alleged ineffectiveness in failing to object to the evidence). (2) The State proved that the victim and defendant were household members under the domestic-violence statute where, for six months to a year before the incident, the victim spent nearly every night in the room of her boyfriend, defendant's stepson, at defendant's home and kept almost all of her personal belongings in the home.

¶ 2   After a jury trial, defendant, Robert Barwicki, was convicted of criminal damage to government-supported property (criminal damage) (720 ILCS 5/21-1.01(a) (West 2020)) (case

No. 20-CF-252) and domestic battery based on insulting or provoking contact (*id.* § 12-3.2(a)(1)) (case No. 20-CM-378) and was sentenced to 23 months' probation and 75 days' jail. On appeal, he argues that (1) the trial court committed plain error by admitting irrelevant and prejudicial evidence and, alternatively, that his trial counsel was ineffective for failing to object to this evidence; and (2) he was not proved guilty beyond a reasonable doubt of domestic battery, because the State did not prove that the victim was a "family or household member" (*id.*) and, therefore, his conviction must be reduced to battery. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant with criminal damage in that he knowingly damaged, without the consent of the Oswego police department, the rear passenger window of a squad car. The State charged him with two alternative counts of domestic battery to Alyssa Rijk, alleging that (1) he made insulting or provoking contact with Rijk when he "smacked her on her face and pushed her off the stairs." and (2) he caused Rijk bodily harm by the same conduct. Relatedly, defendant was charged with interfering with Rijk's reporting of defendant's domestic violence against her (*id.* § 12-3.5(a)). Finally, defendant was charged with domestic battery against Matthew Walendzik (this charging document is not in the common-law record). Before trial, the State dismissed the second alternative count of domestic battery (bodily harm) against Rijk and the charge of interfering with the reporting of domestic violence.

¶ 5      At trial, Walendzik testified as follows. Since 2015 or 2016, he had resided in a house in Oswego with his mother, brother, sister, and defendant. Defendant was married to Walendzik's mother and had been Walendzik's stepfather since Walendzik was a small child. In September 2020, Rijk, Walendzik's girlfriend, was "in a sense living with us. She was staying with me a lot

at the house." She had been living there "[a]bout six months to a year." Walendzik and Rijk slept in his room "every night" and "shared the entire basement area where [he] had [his] whole room."

¶ 6    Walendzik testified that, on September 11, 2020, he got into an argument with defendant and spent the night with Rijk at her parents' home. The next morning, he returned to retrieve some articles because he expected to stay at Rijk's home with her for several nights. When he entered, defendant and Walendzik's younger brother, R.B., were there. Defendant was in the first-floor living room. Walendzik wanted to avoid him, so he and Rijk quietly descended the stairs to the basement and started collecting his things. At some point, defendant came downstairs, approached Walendzik, and told him to get out of the house. Walendzik responded that he was just getting his things. Defendant repeated his demand. He was yelling and "[e]xtremely aggressive."

¶ 7    Walendzik testified that he started to walk away from defendant. Defendant grabbed him and put both hands around his throat and neck. Rijk had her phone out and was telling defendant to get his hands off Walendzik. Defendant "push[ed] her away." Rijk said that she was going to call the police, but defendant forcibly took her phone and tried to exit by walking up the stairs. As he did so, Walendzik grabbed him from behind and held him. Soon, defendant let go of the phone. Walendzik let go of defendant, returned the phone to Rijk, and stepped back.

¶ 8    Walendzik testified that defendant said that he was going to call the police. He said that he broke his leg, and he lay on the staircase to prevent Walendzik and Rijk from leaving. As defendant called the police, Rijk got "a little bit in his face." She and Walendzik told defendant that he had to move. Defendant put one hand on Rijk's chest and "pushe[d] her straight ahead." Rijk got up close and again told him to move. Defendant "slap[ped] her across the face one time." A bookshelf was right next to the stairs and close to a wall. When defendant slapped Rijk on one side of her

face, the other side of her face hit the bookshelf "at full force." She sustained a bruise as a result. Walendzik and Rijk went to his room to await the police.

¶ 9       On cross-examination, Walendzik testified:

> "Q. Now, you indicated that you resided at [the house] at that time, correct?
>
> A. Yes, sir.
>
> Q. [Rijk] was not a resident there, would that be a fair statement?
>
> A. Yes.
>
> Q. She did not receive mail there?
>
> A. No.
>
> Q. That was not her legal residence?
>
> A. No."

¶ 10     Walendzik testified that, on September 11, he and defendant argued over Walendzik's ordering food deliveries at night. On September 12, when defendant entered the basement, he wanted to talk to Walendzik separately from Rijk, but Rijk approached defendant. Rijk did not use "foul language" toward defendant.

¶ 11     Walendzik testified that defendant grabbed him and let go only after Rijk said that she would call the police. Defendant grabbed Rijk's phone and appeared to be trying to leave, but Walendzik restrained him so that he would surrender the phone. When he did, Walendzik took the phone and backed away. Defendant sat on the steps and did not try to leave. He called the police, claimed that his leg was broken, and blocked Walendzik and Rijk from exiting.

¶ 12     On redirect examination, Walendzik testified:

> "Q. Was your girlfriend staying [at Walendzik's house]?
>
> A. Yes, every day of the week essentially.

Q. Did she have clothing there?

A. Yes.

Q. Did she have other personal items there?

A. Yeah, everything.

Q. Okay. So did she keep personal products there as well?

A. Uh-huh. She knew the garage code. She knew everything. She had *** almost all of her clothes there. We attempted to bring her cat there a few times just because she was barely ever home to take care of her cat sometimes because she was with me all the time and going to school all day, ***. But *** she had almost everything at my house. She was staying there seven days a week, every week."

Walendzik testified that his mother, who owned the house, was "okay" with this arrangement.

¶ 13    Rijk testified that, in 2019, she and Walendzik started dating. In September 2020, they lived at his house. She "slept there pretty much every night." She kept clothing, her toothbrush, hair care products, and whatever she needed to get ready in the morning and go to bed there. Sometimes, she visited her cat at her parents' home; mostly, her brother cared for the cat.

¶ 14    Rijk testified that she and Walendzik lived in the basement, which contained a bedroom, living room, bathroom, laundry room, and several closets. Nobody else lived there. Walendzik's mother used the laundry room, and his siblings occasionally ran downstairs. The first floor had a living room, a kitchen, and two dining rooms. The second floor had bedrooms and a bathroom. Rijk "didn't really go upstairs. Mostly just the basement."

¶ 15    Rijk testified that, in September 2020, Walendzik and defendant disliked each other and did not get along. On the night of September 11, Rijk and Walendzik stayed at her parents' house because Walendzik and defendant had gotten into an argument. On September 12, she and

Walendzik returned to his house because he wanted to pick up some things he had left behind the previous evening. They entered the house through the garage. They entered the living room and saw that defendant was lying on the couch. Walendzik's mother was not home, but R.B. was.

¶ 16    Rijk testified that, after entering the house and seeing defendant, she and Walendzik walked downstairs and started to gather some belongings. Defendant came downstairs. He was "agitated and yelling, asking like what [Walendzik and Rijk] were doing there, why we were in the house, telling us to get the heck out of his house," although he actually used a stronger term than "heck." Walendzik and Rijk tried to ignore him, but he got in their way and prevented them from moving around. Soon, defendant put his hands around Walendzik's neck. Walendzik had not previously touched defendant, except perhaps to try to nudge him out of the way. When defendant grabbed Walendzik, he tried to get defendant off and restrain him.

¶ 17    Rijk testified that, as she watched defendant and Walendzik struggle, she yelled at defendant to stop. She had her phone in her hand. At some point, Rijk opened her phone and started dialing 911. Defendant snatched the phone from her. Walendzik tried to get it back, wrestling with defendant. Defendant ran and sat on the stairway, saying that Walendzik had hurt him and that he could not get up the stairs.

¶ 18    Rijk testified that she tried to exit the house, which required going around defendant to climb the stairs. As she got to the second step, defendant pushed her backward. Rijk tried again to climb the stairs. Defendant pushed her face into shelving that was "like a corner cabinet kind of thing. It's right off the edge of the wall in the basement." The push hurt Rijk and upset her emotionally. She and Walendzik retreated to the bedroom. By this time, defendant was on the phone with the 911 operator. The police arrived 15 or 20 minutes later.

¶ 19    Rijk testified that she did not punch or slap defendant. She might have touched him to get him out of her path or to break up his fight with Walendzik.

¶ 20    On cross-examination, Rijk testified that she did not get her "normal mail" at Walendzik's house. However, when she ordered something for herself, she had it sent there because that was "the home [she] was staying at." She had no clothing at her parents' house and no hair care products that she was currently using. As best Rijk could recall, when defendant came downstairs on September 12, he did not ask her to leave. When defendant blocked her and Walendzik from leaving, she used some obscene language toward him. She did not recall the specific physical contact that she had with defendant. She did not recall digging her fingernail into defendant's hand to get back her phone, but she "very well could have."

¶ 21    Anthony Snow, an Oswego police officer, testified as follows. On September 12, 2020, he was dispatched to Walendzik's house. Inside, he saw defendant sitting on the stairs to the basement. Defendant was complaining that his knee and ankle hurt. Paramedics arrived and transported him to Rush Copley Hospital in Aurora.

¶ 22    Later, Snow received a dispatch and drove his squad car to the hospital. Just outside, defendant was standing with two Aurora police officers and hospital security personnel. Snow testified, without objection, that hospital security told him that defendant had caused disturbances in the hospital and would not be admitted. He put defendant into his squad car to transport him to the Oswego police station so that he could get medical assistance in Kendall County.

¶ 23    Snow testified that, sometime after putting defendant into the squad car (which he testified was the property of the City of Oswego, paid for with municipal funds), his sergeant told him to have medical personnel drive defendant to a hospital. Snow pulled over. By this time, defendant

was becoming loud and belligerent. He said he did not feel well, so Snow rolled down one window completely and another partway. He turned on his video camera.

¶ 24    Snow identified a copy of the video recording taken that day and four photographs that depicted a window in the condition it was in after, but not before, defendant rode in the squad car. The exhibits were admitted into evidence, and the video was played to the jury.

¶ 25    In the video, defendant initially complained about his confinement, shouting and cursing. At 5:29 into the video, he told Snow, "Let me out. I can't f*** breathe." Snow rolled down a window, but defendant insisted that Snow open a door. Snow refused. At the 7:00 mark, defendant looked out the left rear window and asked another officer who had arrived separately to open the door. At 7:06, Snow told defendant that he was under arrest for domestic battery. Defendant cursed and insisted that Snow open a window; the other officer told him that the window was open. At 8:30, defendant rolled onto his left side, lifted his right leg, and kicked the right rear window several times. Officer Snow told defendant that he would be charged if he broke the window and he should stop kicking it. Soon, he calmed down. At 11:30, Snow and defendant started talking about whether defendant wanted to go to a hospital. Snow reminded defendant that he had already been "kicked out" of one hospital. At 19:56, defendant exited the squad car to enter the second hospital.

¶ 26    Snow testified that the photographs showed the window that defendant had kicked. The glass was detached from its track within the car door; it was "not *** aligned with the rails that would go up and down." For safety, Snow had to use another squad car.

¶ 27    Snow testified that the paramedics took defendant to Mercy Hospital in Kendall County. Snow then drove there and met with defendant. Snow testified:

"At that point, he was in their emergency area, emergency room area. He got vocal or angry with the nursing staff. At that point he took the C collar off that he clearly had requested from the medics, threw it across the room. At that point security *** and the nursing staff went into his room, had some words, and informed him if he continued to create this behavior, that he would be basically kicked out of Mercy."

¶ 28     Snow testified that defendant calmed down and was eventually discharged. When he left the hospital, he was not wearing a neck brace or a boot on his foot, had no cast on, and entered the squad car with minimal assistance.

¶ 29     On cross-examination, Snow testified that the squad car window was dislodged from its track but not cracked or shattered. He did not recall whether it had to be replaced. Asked whether he had noticed any redness to defendant's neck area, a mark on his left cheek, or a mark on his hand, Snow could not remember. After refreshing his recollection with several photographs, Snow testified that there were red marks on defendant's cheek and hand, but that he could not tell from the photographs whether there were any marks on defendant's neck.

¶ 30     The State rested.

¶ 31     Defendant testified as follows. On September 11, 2020, Walendzik and Rijk left the house. The next morning, they returned unexpectedly to the basement. Defendant went there to talk to Walendzik separately. He told Rijk to leave, but she started swearing and gave him the finger. Soon, Rijk "started to threaten [defendant]. She said that she was gonna call 911." He let her do so, but after a "couple of seconds, couple of minutes, *** nothing happened." Rijk then showed him her phone. The testimony continued:

"Q. Okay. Did you take the phone from her?

A. So basically I wouldn't say that I took it away from her. She was like showing me the phone and she was kind of like, *** holding the phone in her hand. So it's like the kids are playing with the toys. So one child that grabs the toy away from the other child, so it's like a game.

Q. Okay. Did the phone ever wind up in your hand?

A. So I took the phone and I thought she was gonna follow me outside."

¶ 32 Defendant testified that he then turned to go upstairs. As he was about three steps away from Walendzik and Rijk, Rijk told Walendzik to get her phone. Walendzik grabbed defendant from behind. Before then, defendant and Walendzik had not touched each other. After Walendzik grabbed him, defendant did not put his hands on Walendzik's throat. He reached the second step of the staircase and noticed his leg had been twisted. As he held his phone in one hand and Rijk's phone in the other hand, she tried to get her phone from him. He did not want to return it, so she scratched his hand with her fingernail. Finally, Rijk pulled her phone out of his hand. The trial court admitted a photograph of the scar that, according to defendant, Rijk made on his hand.

¶ 33 Defendant testified that, while Rijk was trying to get her phone back, Walendzik held him by the throat and bent him over. Defendant let go of Rijk's phone and with his free hand grabbed the staircase railing as Rijk began shouting. Defendant felt pain in his leg and throat. He sat down on the stairs and used his own phone to call the police. He stayed in the middle of the staircase, so Walendzik and Rijk could not leave. At one point, Rijk tried to get past him. He told her to stop and not walk over him. He raised his right hand while he held his phone in his left hand. The examination continued:

"Q. At that time, when she tried to get past you, did you push her?

A. I was basically defending myself. I wasn't standing. I was laying [*sic*] down. What if she stepped on me or something?

Q. Okay. Did you ever extend your hand out to push her away from you?

A. No. I just—no, I didn't push her. I didn't want to push her, anything like that. I just extended my hand so *** she wouldn't be able to walk on me."

¶ 34    Defendant testified that he felt pain in his throat and leg. The jury was shown a photograph taken of defendant's face after the encounter.

¶ 35    On cross-examination, when asked how long he had known Rijk, defendant testified, "I didn't. I mean, [Walendzik] knew her." He did not know how long she had been sleeping over at the house and "wasn't really interested."

¶ 36    Defendant testified that, when he entered the basement on September 12, he was not upset and just wanted to talk to Walendzik without Rijk present. Walendzik was several inches shorter than defendant, and, when defendant was above him on the second step, Walendzik grabbed him around the waist. Defendant did not see where Walendzik was standing at that time.

¶ 37    Defendant testified that Rijk tried to leave, but he did not let her. He put his hand out so that she would not step on him. Asked how Rijk hit her head on the wall, defendant testified that, as he was calling 911, she came over and said that she would take his phone from him. He held the phone tightly in his hands, which were pointing downward as he lay on the fourth or fifth step from the bottom. Rijk must have been on the first or second step. Defendant continued:

"So basically she hit her head when the phone was slippery and the phone slipped from—she was trying to take it from my hand, *** there was a *** corner bookshelf that was like three inches away from the wall, so then she hit it with her head."

¶ 38    Defendant rested. In rebuttal, Rebecca Hayes, an Oswego police officer, testified that, on September 12, she was dispatched to Walendzik's home, where she met with defendant's 12-year-old son, R.B., defendant, Walendzik, and Rijk. Walendzik had red marks on both sides of his neck. Rijk had some light redness on both sides of her upper facial area. In her brief meeting with defendant, Hayes did not see any marks on him.

¶ 39    R.B. testified that, in September 2020, he lived with his mother, his sister, Walendzik, and defendant. Rijk also lived there. R.B. did not remember how long she had lived there, but it was more than a few weeks. Rijk "would usually stay there."

¶ 40    R.B. stated that he was on the first floor on the morning of September 12, when he heard defendant, Walendzik, and Rijk arguing in the basement. He went to the top of the stairs and looked down. Defendant was on the stairs. R.B. testified further:

"Q. And what did you see happen at the bottom of the stairs?

A. So what [defendant] was doing was he was stopping *** [Walendzik and Rijk] from going up the stairs.

Q. Okay. What else did you see [defendant] do, if anything?

A. Try and push them away and like trying to do anything to not get them from— to going upstairs [*sic*].

Q. Did you see your dad ever strike [Rijk]?

A. Yes.

Q. And what happened? Describe that for the jury.

A. So what happened is that he hit [Rijk's] phone down when she took her phone out and basically pushed her too.

Q. Did you ever see [Rijk's] head hit the wall or the bookcase?

A. No, but I heard it.

Q. How did you hear it?

A. It was like a bang on the wall.

Q. Were you not watching that part?

A. I was, but I couldn't see [Rijk]. It was on the side.

Q. Okay. Did you see any movement out of [defendant] when her head hit the wall?

A. Yeah.

Q. What did you see?

A. He was pushing.

***

Q. So just to be clear, was [Rijk] trying to get her phone back and that's when she hit her head on the wall, or did you see [defendant] hit [Rijk]?

A. Hit [Rijk].

Q. And then her head hit the wall?

A. Yes."

¶ 41    On cross-examination, R.B. testified that he never saw Rijk hit her head on the bookcase. He heard a noise but did not know what it was. On redirect, R.B. testified that, from the top of the stairs, the bookcase was out of his line of sight. After he saw defendant hit Rijk, "something hit the wall," and he was "pretty sure" it was Rijk's head.

¶ 42    In closing argument, the State contended that Rijk was a member of defendant's household, as she shared the house, spent most of her time there, had her clothing and personal items there, and ordered purchases shipped there. Next, the State argued that defendant committed battery against Rijk in that, out of anger at her and Walendzik, he made insulting or provoking contact

with Rijk: she, Walendzik, and R.B. all testified that defendant pushed her face into the bookshelf. As to criminal damage, defendant knocked the squad car window off its track and disabled it, as testified to by Snow and as shown on the video.

¶ 43 Defendant argued that the evidence cast doubt on whether he had been the aggressor in the confrontation, as he testified that he merely wanted to talk to Walendzik alone but that Walendzik and Rijk frustrated his efforts because of their "hatred, or at the very least, severe disdain" for defendant. Further, defendant was the one who called 911 "because he was the victim of the abuse in this case" and never tried to leave the house. Finally, the defense argued that the State did not prove the criminal damage charge, as there was no evidence that the squad car window was damaged or that the police department incurred any expense.

¶ 44 In rebuttal, the State addressed defendant's argument that Walendzik and Rijk did not like him. Specifically, the State asked, "What ha[d] [defendant] shown you to be likeable?" The State also remarked that defendant "[could not] get along with police officers" or hospital personnel because "he [was] being an angry, aggressive individual." Also, at the second hospital, defendant "rip[ped] off the C collar and again continue[d] to be argumentative." The State contended that defendant's entire course of conduct, including his confrontation with Rijk and later actions, showed that he needed to be in control of every situation. Walendzik, Rijk, and R.B. all testified that they saw defendant hit Rijk. Finally, the evidence showed that defendant had damaged the squad car window, whatever it cost the police department.

¶ 45 The jury found defendant guilty of domestic battery to Rijk and criminal damage. It acquitted him of domestic battery to Walendzik. Defendant filed a posttrial motion alleging neither the improper admission of evidence nor improper closing argument. The trial court denied the motion and sentenced defendant to 23 months' probation and 75 days' jail. He timely appealed.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, defendant contends first that he was prejudiced by the admission of evidence of his behavior at the hospitals. He argues that this evidence was irrelevant to the charges and served only to suggest a propensity toward aggression. Defendant concedes that he forfeited the issue by failing to object at trial or raise it in his posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48. However, he contends that it should be reviewed as plain error. Alternatively, he contends that his trial counsel was ineffective for failing to preserve the issue.

¶ 48    We first address the plain-error rule. Under the rule, a court of review may address an unpreserved error when "a clear or obvious error occurred" and either (1) the evidence was so closely balanced that, by itself, it "threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Henderson*, 2017 IL App (3d) 150550, ¶ 38; *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Defendant contends that there was a clear or obvious error in the admission of evidence of his behavior at the hospitals after the alleged domestic battery, because (1) the evidence was not legally relevant to any of the issues involved in either charge (see Ill. R. Evid. 403 (eff. Jan. 1, 2011)) and (2) it was introduced solely to persuade the jury that, because defendant was belligerent with others after his encounter with Rijk, he committed the domestic battery against her (see Ill. R. Evid. 404(a) (eff. Jan. 1, 2011); see also *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 72 (evidence of other crimes or bad acts is inadmissible merely to prove propensity to commit the charged offense)).

¶ 49    Ordinarily, the first step in a plain-error analysis is determining whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49. We note that the evidence of defendant's behavior

at the first hospital appears to have been relevant to his state of mind when he damaged the squad car's window. However, we need go no further on the merits of defendant's admissibility argument; we conclude that even if there was error, defendant has not satisfied either prong of the test.

¶ 50    On the first prong, the evidence was not "so closely balanced" that the admission of defendant's acts threatened "to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187.[1] There was strong evidence of defendant's guilt on both charges. On the domestic battery charge, Walendzik, Rijk, and R.B. all testified that they saw defendant push Rijk. Although Rijk was not a disinterested witness and Walendzik could be considered biased in favor of Rijk and against defendant, R.B. was defendant's son and there was no reason to believe that he would be biased in favor of the State, certainly not to the point of wanting to see his father get convicted. Moreover, the State did not need to prove that Rijk was injured, but only that defendant's push of her was insulting or provoking—an element to which she testified, and which was not contested. Proving

---

[1]Defendant contends that the State did not prove beyond a reasonable doubt that Rijk was a member of his household, but he does not contend that the evidence at issue here bore at all on the jury's resolution of this question. Defendant argues that the evidence of his behavior at the hospitals was impermissibly introduced to prove his propensity toward committing the batteries to Walendzik and Rijk. As he implicitly recognizes, this possible inference had no bearing on whether Rijk shared his household, which turned on altogether different evidence. It is unreasonable to suspect that defendant's belligerent conduct at the hospitals affected the jury's consideration of whether he and Rijk shared a common household.

the offense required proving only that defendant pushed Rijk, not where she landed or whether she was injured.

¶ 51    Defendant's testimony on cross-examination was essentially that he did not strike Rijk, but that she tried to pull his phone away from him and she slipped, causing her to strike her head on the bookshelf. He claimed Rijk did this to stop him from calling the police.

¶ 52    Aside from contradicting all other witnesses, this explanation suffered two serious flaws. First, on direct examination, defendant omitted to mention Rijk's attempt to take away *his* phone, implying that he called the police without any interference from anyone. Second, his belated explanation (only on cross-examination) of Rijk's contact with the bookshelf made no sense. It was undisputed that Rijk *herself had already said she* would call the police on *her* phone. Defendant himself testified that she "threatened" him by saying that she would call the police. Why would Rijk want to stop defendant from doing exactly what she had wanted to do?

¶ 53    Thus, the pertinent evidence on the domestic battery charge was not closely balanced. Three witnesses testified consistently on the crucial act. Only defendant offered a contrary account, and it was deeply flawed. Moreover, the State's reference in closing arguments to defendant's conduct at the hospitals was fairly brief, and the State relied far more on the testimony of the occurrence witnesses. Even as to defendant's anger management problems, the State relied primarily on the evidence of his animosity toward Walendzik and Rijk (which he mostly conceded and his counsel argued) and the eyewitness testimony of his conduct on September 12. Moreover, the jury acquitted defendant of domestic battery to Walendzik, implying that it rejected any inference that defendant's anger at the hospitals showed his propensity to commit that offense.

¶ 54    The evidence on the criminal damage charge also was not closely balanced. The video and Snow's testimony provided undisputed proof that defendant kicked and dislodged the window,

forcing Snow to change vehicles. Insofar as the evidence of defendant's conduct at the hospitals might be seen as improper evidence of his propensity to damage the window, its admission was harmless, as the other evidence of the offense was overwhelming.

¶ 55     We conclude that defendant has failed to establish first-prong plain error.

¶ 56     Defendant contends next that the admission of legally irrelevant evidence was second-prong plain error because it was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Herron*, 215 Ill. 2d at 187. Defendant relies on two opinions to support his claim, but neither applies here.

¶ 57     First, defendant contends that *People v. Maounis*, 309 Ill. App. 3d 155, 161-62 (1999), holds that the combination of irrelevant evidence and argument based on that evidence amounts to second-prong plain error. However, *Maounis* was not a second-prong plain error case. In addressing improper propensity evidence introduced in the defendant's trial for armed robbery, the court began by articulating the plain-error rule in its entirety (both prongs). See *id.* at 161 (citing *People v. Vargas*, 174 Ill. 2d 355, 363 (1996)). Next, as authority for undertaking plain-error review of the defendant's contention, *Marounis* cited only *People v. Barnett*, 48 Ill. App. 3d 121, 126 (1977), without elaboration. *Barnett*, however, was a first-prong plain error case—it rejected a claim of plain error in the admission of propensity evidence on the basis that "the proof of [the] defendant's guilt was very strong" (*id.*)—*i.e.*, the evidence was not closely balanced.

¶ 58     Second, defendant cites *People v. Johnson*, 208 Ill. 2d 53, 64 (2003), in which the defendants in the consolidated appeals did obtain relief based on second-prong plain error, *i.e.*, error that is "so fundamental *and* of such magnitude that the accused is denied the right to a fair trial *and* remedying the error is necessary to preserve the integrity of the judicial process." (Emphasis added.) More specifically, the court stated that "a *pattern* of intentional prosecutorial

misconduct *may* so *seriously undermine the integrity of judicial proceedings* as to support reversal under the plain-error doctrine." (Emphasis added.) *Id.* at 64.

¶ 59    *Johnson* involved convictions of the murders of two men, one a police officer. *Id.* at 70, 89. In finding second-prong plain error, the supreme court explained first that the State introduced a great deal of irrelevant and highly inflammatory evidence, including the display of the officer's bloody uniform and testimony about the officer's career and family, his oath of office, and his badge. *Id.* at 73-75. Second, in closing argument, the State repeatedly engaged in a variety of prejudicial improprieties, including, (1) urging the jury to support the police and combat crime in general; (2) likening one of the defendants to a wild animal and implying that he was " 'evil' " (*id.* at 80); (3) misstating the evidence of what the defendants did after the murder and stating that they were " 'celebrating death' " (*id.* at 81); (4) baselessly accusing the defense attorneys of dishonesty; and (5) trying to create sympathy for the officer's family (*id.* at 82-83). The improprieties in evidence and argument were so extreme as to create second-prong error. *Id.* at 84.

¶ 60    When prosecutorial misconduct falls short of the extreme level in *Johnson*, courts will not find second-prong plain error. In *People v. Tolliver*, 347 Ill. App. 3d 203, 223-24 (2006), the appellate court noted that, during the defense questioning of a State witness, the prosecutor engaged in improper " 'stage whispering' " and " 'editorializing' " while objecting to several questions. However, the court declined to find second-prong plain error, explaining that the prosecutor's conduct was far less "repeated or egregious" than that in *Johnson*. *Id.* at 224. In *People v. Williams*, 262 Ill. App. 3d 808, 819-20 (1994), the defendant contended that the trial court erred in admitting evidence of his membership in a street gang. The appellate court held that any error was insufficiently serious to warrant plain-error review. *Id.* at 820.

¶ 61    We conclude that the alleged errors here were not remotely so serious or pervasive as to trigger second-prong plain-error review. Thus, the defendant has failed to establish or sustain his claim of error.

¶ 62    Defendant contends alternatively that his trial counsel was ineffective for failing to preserve the alleged errors. To establish ineffective assistance, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable and (2) it is reasonably probable that, absent counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 688, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). Based on what we noted in our discussion of first-prong plain error, defendant has failed to show prejudice. The evidence of his behavior at the hospitals was a small portion of the State's case, and the remaining evidence was not closely balanced. As defendant has shown neither plain error nor ineffective assistance, we reject his first claim of error.

¶ 63    We turn to defendant's other contention on appeal: that he was not proved guilty beyond a reasonable doubt of domestic battery, as opposed to simple battery, because the State did not prove that Rijk was a member of his household. For the following reasons, we disagree.

¶ 64    On a challenge to the sufficiency of the evidence, a court asks only whether, after viewing the evidence in the light most favorable to the prosecution, any reasonable fact finder could have found the essential elements of the charged offense beyond a reasonable doubt. *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002). The credibility of the witnesses and the weight to be given to evidence are within the prerogative of the fact finder. *People v. Holmes*, 141 Ill. 2d 204, 242 (1990). Moreover, we must allow all reasonable inferences from the evidence in favor of the prosecution. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 65    To obtain a conviction of domestic battery as charged here, the State must prove that the defendant made "physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2(a)(2) (West 2020). As pertinent here, " 'family or household members' " include "persons who share or formerly shared a common dwelling[.]" *Id.* § 12-0.1. The statute does not define "common dwelling."

¶ 66    "There can be no bright-line test for determining household membership," and "[e]ach case must be decided on its specific facts." *People v. Almore*, 241 Ill. 2d 387, 396 (2011). Among these facts are how long the parties have resided together, the nature of their living arrangements, whether they had any other living accommodations, whether the parties kept their personal items at the shared home, and whether they shared the privileges and duties of a common residence. *People v. Pence*, 2022 IL App (2d) 210309, ¶ 47. Defendant argues that, for various reasons, these criteria did not support the verdict.

¶ 67    First, defendant argues that there was "conflicting evidence as to whether Rijk actually lived" at the house on September 12, 2020. He notes that although Rijk and R.B. testified that she lived there, Walendzik testified on cross-examination that Rijk lived there only "in a sense" and that the house was not her legal residence. Further, defendant testified that he did not consider Rijk as a person he lived with.

¶ 68    The infirmity of this argument is obvious: conflicting evidence does not establish a reasonable doubt but merely creates issues for the trier of fact to resolve. Our standard of review requires us to view the evidence in the light most favorable to the prosecution and not to reweigh the evidence.

¶ 69    Moreover, defendant's summary of the evidence is selective. It ignores Walendzik's testimony that Rijk was "staying with [him] a lot" at the house over the prior six months to a year,

slept in his room "every night," "shared the entire basement area where [he] had [his] whole room," and was staying there "every day of the week essentially" and "seven days a week, every week." Rijk herself testified that she kept almost all of her personal belongings there and almost none at her parents' house.

¶ 70    Defendant also notes that the house was not Rijk's legal address and that she did not receive her mail there unless she specifically requested it to be sent there. However, when Rijk ordered items for delivery, she had them sent to the dwelling. Nothing in the statute or case law says that a person can have only one household or residence. That Rijk's parents' home was her legal address where her regular mail was sent tended to prove that she shared a residence with her parents, but it did little, if anything, to disprove that she shared another residence with Walendzik and others.

¶ 71    Defendant next argues that, even if Rijk did reside at the house, the State failed to prove that she shared a common dwelling with him "as they lived in two separate areas of the house exclusive from one another." Defendant argues that he and Rijk spent most of their time on different floors, defendant seldom venturing into the basement and Rijk spending little time elsewhere. He likens their residential relationship to two people living in separate apartments in the same building.

¶ 72    Again, defendant requests we reweigh the evidence and slights strong evidence on which the jury rightly could base a finding that he and Rijk shared the house. They were not sealed off from each other's living quarters as if they lived in separate apartments where each could block trespass by the other. Neither the entrance nor the house's interior was blocked off or placed off-limits to Rijk. Not only could Walendzik go anywhere in the house with Rijk accompanying him, but Rijk knew the garage code and could let herself in. Walendzik's mother, who owned the house, was agreeable to this arrangement. Moreover, on September 12, Walendzik *and* Rijk entered the

house by entering the first-floor living room, where defendant was lying on the couch. As Rijk could enter the house at will, and her entry immediately placed her in a first-floor room where defendant routinely spent time, it was a fair inference that Rijk and defendant were not nearly the quasi-strangers he seeks to portray here. Rijk and defendant both had free access to the first floor and the basement. Nothing prevented them from going to either level. Both routinely traversed the first floor, at the very least. And, as defendant's longtime stepson had his living quarters in the basement, the jury could infer that defendant could enter that space. Indeed, nothing blocked him from going there on September 12.

¶ 73　The evidence allowed the jury to infer that Rijk routinely entered the house (both with and without Walendzik) and routinely returned there after work or school (with or without Walendzik). Even if the jury were somehow compelled to find that defendant and Rijk did not share the *whole* house, it could still find that they shared the house.

¶ 74　Defendant argues next that the *Almore* factors, as applied here, show that the State did not prove that he and Rijk belonged to the same household. We consider these factors in turn.

¶ 75　First, defendant argues that Rijk "stayed in the basement for more than a few weeks, and possibly between six months and a year, but this alone cannot lead to the conclusion" that she was a member of his household. Again, this argument ignores our standard of review. Viewed in the light most favorable to the prosecution, the evidence showed that Rijk had resided in the house for at least six months. Furthermore, even if this evidence *alone* did not prove household membership, the jury could reasonably find that Rijk's long and consistent residence in defendant's house militates in favor of finding that she was a member of defendant's household.

¶ 76　Second, defendant contends that Rijk did have "some personal items at [the house], but her cat still was at her [parents'] home." Defendant's use of the word "some" is disingenuous. Rijk

testified that, while staying at Walendzik's home (for six months to a year before September 2020, according to Walendzik) she kept there all her clothing, all the hair care products that she currently needed, everything that she needed to start her day and to end her day, and any consumer items that she bought. That strongly supported a finding that she was a member of the household. Also, Rijk testified that her cat was absent only because of circumstances beyond her control. Anyway, there was no reason Rijk could not be a member of defendant's household, even if she made occasional intraday visits to her cat before returning to the Walendzik house.

¶ 77    Defendant notes next that Rijk spent most of her time in the basement, while he spent little time there and seldom interacted with Rijk. Defendant also notes that Rijk still received most of her mail at her parents' home. We have already addressed why these considerations provide little, if any, help to defendant.

¶ 78    Finally, defendant notes that there was not much evidence that he and Rijk shared the privileges and duties of a common residence. However, the evidence allowed the jury to conclude that both had the privilege of staying there every night and keeping most of their possessions there—privileges granted by the house's owner, Walendzik's mother. Both could enter and exit the house via the garage whenever they chose. Although Rijk did not spend much time upstairs, there was no evidence that she was forbidden to do so.

¶ 79    When viewed in the light most favorable to the prosecution, the evidence proved that, for six months to a year before September 12, 2020, defendant and Rijk used the same house as their primary residence where they lived with their respective intimate partners, kept all or most of their possessions, slept almost every night, and entered and exited as they chose, with free access to the garage and at least two floors of the house. Both had a close personal relationship with Walendzik,

who resided there full-time. The jury's finding that they shared a common dwelling was supported by proof beyond a reasonable doubt.

¶ 80                                    III. CONCLUSION

¶ 81     For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 82     Affirmed.